Bobby **BATTLE**, Plaintiff,

**United States of America, Plaintiff-Intervenor,**

v.

**Park J. ANDERSON, Warden et al., Defendants.**

Civ. No. 72–95.

United States District Court,
E. D. Oklahoma.

May 30, 1974.

Mary E. Bane and Stephen Jones, Oklahoma City, Okl., and the American Civil Liberties Union of Oklahoma, Oklahoma City, Okl., for plaintiff, Bobby Battle.

Jesse H. Queen, Quinlan J. Shea, Jr., Thomas R. Sheran, Charles N. Ory and Margie A. Utley, Dept. of Justice, Washington, D. C., for plaintiff-intervenor, United States.

Paul Crowe, Kay Karen Kennedy and Kenneth Deleshaw, Jr., Asst. Attys. Gen., Oklahoma City, Okl., for defendants, Leo McCracken, Roy Sprinkle, Sam C. Johnston, Captain Black, Danny Nace and Otis P. Campbell.

Willard Gotcher, McAlester, Okl., for defendant, Park J. Anderson.

## MEMORANDUM OPINION

### JUDGMENT, DECREE, INJUNCTION AND ORDER FOR REMEDIAL ACTION

BOHANON, District Judge.

*Preliminary Statement*

This case was initiated on April 24, 1972, with the filing of a *pro se* complaint by Bobby Battle, a prisoner at the Oklahoma State Penitentiary.

On July 27, 1972, plaintiff Battle filed an amended complaint on behalf of himself and other inmates of the Oklahoma State Penitentiary alleging deprivations of rights secured by the Federal Constitution and Civil Rights laws including the rights to due process and equal protection of the laws, to free speech, to petition for the redress of grievances, to have access to the courts and to be free from cruel and unusual punishment. The complaint seeks injunctive relief, on behalf of all members of the plaintiff class, to remedy the alleged misconduct of the defendants as well as monetary damages for plaintiff Battle.

Named as defendants were Leo McCracken, Director of Corrections, Park J. Anderson, Warden, and Sam C. Johnston, Deputy Warden of the State Penitentiary at McAlester. Since the commencement of this action, Leo McCracken has been replaced by John Grider, who now serves as Acting Director of Corrections, and Park J. Anderson has been replaced by Sam C. Johnston, who now serves as Acting Warden of the State Penitentiary at McAlester, and Mr. Pete Douglas has replaced Sam C. Johnston as Acting Deputy Warden. Mr. Roy Sprinkle, Deputy Director of Corrections in charge of Institutions, Captain Black, Danny Nace and Otis Campbell, Correctional Officers at the State Penitentiary, have been added as defendants.

On March 15, 1973, the late Judge Edwin Langley granted the United States' Motion to Intervene pursuant to Title IX of the Civil Rights Act of 1964, 42 U.S.C. § 2000h–2. The complaint in intervention alleged segregation by race in housing assignments and certain other aspects of penitentiary operations.

On March 5, 1974, the Court granted the United States' motion to amend its complaint in intervention which now alleges, in addition to the allegations of the original complaint in intervention, that the defendants have discriminated against black inmates in making job assignments and in the operation of the penitentiary disciplinary system; and that they have, with regard to all inmates of the Oklahoma State Penitentiary, without regard to race, subjected them to disciplinary procedures and taken disciplinary action against them without providing due process of law; subjected those inmates in disciplinary segregation to cruel and unusual punishment by depriving them of food, clothing, bedding, light and necessary

personal hygiene items; placed inmates in non-disciplinary administrative segregation without providing them with due process of law and subjected them to unreasonable conditions of confinement; inflicted upon inmates summary punishment without due process of law and cruel and unusual punishment by the use of chemical agents, including mace and tear gas; inflicted upon inmates cruel and unusual punishment by maintaining and operating a medical care delivery system that is incapable of providing and has failed to provide adequate medical care; imposed upon inmates arbitrary and unreasonable restrictions on mailing privileges, including censorship and rejection of mail to and from attorneys, courts, government officials, family members and religious ministers; refused inmates the right to subscribe to or receive personal legal reference materials, as well as certain other periodicals; and denied inmates adequate access to the courts by failing to provide an adequate law library or any reasonable and adequate alternative thereto and by specifically refusing to permit inmates to have in their possession any personal legal reference materials or to assist each other on legal problems.

The parties have conducted extensive pretrial discovery consisting of depositions, inspections and investigations conducted by attorneys, FBI agents and experts in penology.

At the final pretrial conference held on March 4, 1974, counsel orally stipulated and agreed and the court ordered that all depositions taken prior to trial be admitted into evidence and made a part of the record.

Trial on the merits was heard at McAlester, Oklahoma, on March 14 and 15, 1974. At the outset, counsel for all parties stipulated and agreed to the authenticity of copies of documents marked exhibits 1 through 161 and contained in 18 bound volumes previously tendered to counsel and the court by the United States. It was further stipulated and agreed and the court ordered that the said exhibits be admitted into evidence and made a part of the record in this case.

Upon the basis of the depositions and exhibits and the oral testimony heard at the trial of this case and the cases of Holland et al. v. Anderson (No. 73–324) heard on March 12, 1974, and the consolidated cases of Barnett et al. v. Hall (No. 73–237), Johnson v. Anderson (No. 74–8), Barnett et al. v. Pontesso (No. 70–97) and Johnson et al. v. Anderson (No. 72–90) heard on March 13, 1974, the court makes its findings of fact and conclusions of law as follows:

*Findings of Fact*

1. The Oklahoma State Penitentiary system consists of a main maximum security facility at McAlester and several subsidiary institutions located at McAlester and other locations throughout the southeastern and western portion of Oklahoma. These subsidiaries include a dual unit women's ward and a male trusty unit which are also located at McAlester; a medium security vocational training school located at Stringtown, Oklahoma, about 40 miles south of McAlester; a smaller minimum security facility for vocational training located near Hodgens, Oklahoma; and an Honor farm near Farris, Oklahoma.

2. The Oklahoma State Penitentiary System was established by law for the purpose of housing persons committed to the custody of the Department of Corrections under the administrative direction and control of the Division of Institutions, Title 57 O.S.A. § 509.

3. The Board of Corrections, composed of seven members appointed by the Governor, appoints the Director of the Department of Corrections. The Board has statutory authority to establish policies for the operation of the Department. Title 57 O.S.A. §§ 503, 504. The Director of the Department of Corrections is vested by statute with the authority and responsibility for the operation of all facilities within the department, for prescribing rules pertaining to the management of said institu-

tions and for the control, care and treatment of inmates remanded to the custody of the Department of Corrections. Title 57 O.S.A. §§ 507 and 510. Such rules, when reduced to writing, are customarily promulgated in the form of departmental policy statements, but may also be issued in the form of operations memoranda.

The Deputy Director of Corrections in charge of Institutions is appointed by the Director and is charged with the administrative responsibility for the operation of all facilities within the Department of Corrections. Title 57 O.S.A. §§ 508, 509.

The Warden of the Oklahoma State Penitentiary at McAlester is vested by statute with the responsibility for performing all duties pertaining to the penitentiary as are fixed by the Director of Corrections. Title 57 O.S.A. § 510. The established duties of the Warden include supervisory responsibility for the government and operation of the Oklahoma State Penitentiary at McAlester, Oklahoma, and its subsidiary units. Written rules issued pursuant to the authority of the Warden are promulgated in the form of memoranda, directives, etc.

4. All persons convicted of felonies and sentenced by duly constituted courts of the State of Oklahoma to a term of imprisonment which is not to be served in a county jail are committed to the custody of the Oklahoma Department of Corrections to be confined in one of the facilities subject to the jurisdiction of the Department. Title 57 O.S.A. § 521.

5. Between January, 1970 and July 27, 1973, the total population in the penitentiary system averaged about 2,990 male and 120 female inmates. The largest concentration of inmates in the system was "behind the walls" at the main facility at McAlester.

6. On July 27, 1973, a riot occurred at the McAlester facility which resulted in the destruction of some physical facilities and damage to others. Following the riot, many programs, procedures, practices and operations that had been in effect at the penitentiary were either eliminated or curtailed. The general inmate population was placed on a twenty-four-hour lockdown which continued with only minor modifications at the time of the trial in this case. Numerous examples could be cited from the record of practices and conditions which were justified as emergency measures in the immediate aftermath of the riot and even for some time thereafter, but which were still in substantial effect at the time of the trial of this case, long after their justification had ended.

7. During the 7 months of 1973 prior to the riot, the inmate population at the main facility averaged about 1778 or 57% of the total penitentiary population. The racial composition of the population at the main facility averaged 29.5% Black and 70.5% non-Black inmates. Many of these inmates were transferred to subsidiary institutions and to municipal and county holding facilities and commitments to McAlester were suspended following the riot. The population at McAlester dropped to 1338 in August 1973, and after several additional reductions has leveled off at approximately 900 inmates since the first of this year.

8. Prior to the riot, the facilities at the main penitentiary consisted of an administration building, four general population cellhouses and a mess hall radiating from a central rotunda, a maximum security unit and combination hospital-gymnasium and a series of industrial and maintenance buildings, some of which were located in the "industrial area" north of the main walls. Two of the general population cellhouses were constructed in 1907. The third and fourth units were added in 1932 and 1935. The design capacity of the penitentiary was approximately 1,200.

9. The civilian staff level of about 350 at the main McAlester facility has remained fairly constant. Out of this total civilian staff, about 242 have been employed as security personnel holding the rank of Correctional Officer I (about 160 men); Correctional Officer

II (about 65 men); Correctional Officer III or Lieutenant (about 11 men); and Correctional Officer IV or Captain (about 6 men). Under the normal conditions as they existed before the riot, the security staff provided 24 hour, 7 day a week supervision and surveillance over the cellhouses, lockup areas, guard towers and hospital complex. The staff also provided daytime supervision and surveillance over the work areas (industrial, maintenance and administrative), the yard and special inmate work gangs. They also supplied the supervision required for the transfer of inmates to other Oklahoma penal facilities, to outside medical facilities and to the courts. Their post-riot activities have generally consisted of carrying out such security functions as were deemed necessary, from time to time, by penitentiary authorities.

10. The security force at the Oklahoma State Penitentiary at McAlester is understaffed and spread far too thin. The continuing deficiencies in needed personnel have been at least 30 to 35 percent less than the level required to maintain adequate supervision and control. This limited staff is inadequately trained and poorly supervised. There is a high turnover among correctional officers; the monthly rate reaching 8 to 9 percent, particularly among lower echelon security personnel. Proper training may well be impossible with this shortage of personnel accompanied by such a continuing turnover rate.

The available security force is simply inadequate to maintain proper order and carry on even minimally effective corrections operations. Staffing deficiencies have been a causative factor in the conditions which existed and still exist at the penitentiary. The level of violence inside the penitentiary has been alarming. From January 1970 until July 27, 1973, defendants' own records reflect a total of 19 violent deaths. In addition, there were 40 stabbings and 44 serious beatings of inmates. Some of the violence occurred in the cellhouses where frequently only one guard was available for an entire cellhouse. Some violence occurred on the prison yard where frequently only one or two guards were available to supervise and control the entire general population.

11. Since the riot, lack of adequate security has been used continously as an excuse for the confinement of the majority of inmates in their cells 24 hours a day, in complete idleness and without any form of exercise or other recreation. As previously indicated, this massive and almost total lockdown has continued for over 8 months, with the limited exception that inmates not confined in disciplinary maximum security have recently been granted the meager privilege of eating one or two meals in the mess hall every other day provided adequate security is available. Only a limited number of inmates are regularly permitted out of their cells to perform penitentiary maintenance and housekeeping chores such as preparing food and repairing or maintaining the physical complex.

*Racial Discrimination and Segregation*

12. Prior to the July riot, the policy and practice at the Oklahoma State Penitentiary was to maintain a prison system segregated by race and by means of which black inmates were subjected to discriminatory and unequal treatment. Except for the maximum security unit, where inmates under disciplinary punishment were confined in single cells, all inmates were routinely assigned to housing units on the basis of race. The reception center, the mess hall, the recreation yard and barber facilities were racially segregated. Black inmates were discriminated against in job assignments and were subjected to more frequent and disparate punishment than white inmates. The guard force was and remains predominantly white. A policy statement issued by the Department of Corrections on October 20, 1972, declared the official departmental policy to be that all of its correctional facilities would be integrated in order to insure equal rights and equal opportunity to all persons confined therein. This policy

statement also directed correctional administrators to formulate, implement and follow up procedures to insure that discrimination did not occur in practice. The need to increase minority personnel at every level was made clear and it was suggested that each correctional facility appoint an official to be directly responsible for supervising the recruitment and fair treatment of minority employees. A departmental operations memorandum issued on the same date set forth specific requirements for the implementation of the departmental policy statement. Wardens at each state penal facility were directed to prepare plans for complete integration, to take immediate action to inform and instruct all employees regarding the official policy on racial segregation and of their obligations thereunder, to implement an objective and fair classification system for inmates with respect to all aspects of institutional life, to inform the inmates of the racial segregation policy, and to make telephonic progress reports each Monday morning to the Deputy Director of Institutions or the Director of the Department of Corrections detailing the percentages of integration at each location and any major problems encountered. Both the policy statement and accompanying operations memorandum were completely ignored by the Warden at the Oklahoma State Penitentiary at McAlester. Racial segregation, as had been practiced prior to the issuance of these directives, continued unabated. Not until the July riot did any noticeable changes occur. Only at that time, operating under emergency conditions, were inmates randomly lined up and ordered into cells. At the present time the housing units are not racially segregated. Due to perceived emergency conditions the prison population is temporarily confined to single cells under 24 hour lockdown. The defendants have instituted a security classification system under which inmates are assigned either a medium, maximum, or close custody grade and separated into various housing units according to their respective classifications. The new grading system does not, however, provide for specific cell assignments and transfers on a non-racial basis. Accordingly, there is no present assurance that housing units will not become resegregated when normal operations are restored.

### Disciplinary Rules, Punishment and Procedure

13. Prior to the July 27, 1973, riot, defendants administered a disciplinary program which could result in punitive sanctions including punitive segregation as well as loss of incentive time and other privileges. These sanctions were imposed pursuant to a disciplinary process which is described in departmental policy statements and in the most recent inmate manual. Viewing the disciplinary process as a whole, to include both policies and practices, defendants have failed to afford inmates the procedural safeguards which are minimally necessary to insure fundamental fairness. The record discloses the following:

(a) Inmates are not fairly adequately apprised of the conduct which can lead to disciplinary action. Some, but not all, punishable conduct is contained in various rule books and manuals. There is, however, no policy limiting punishment to listed infractions; some infractions are specified in employee manuals, but excluded from inmate rule books; some of the most common, minor infractions are nowhere listed or defined although punishment routinely results in the event of violations. In some instances, inmates have been punished for violating unwritten rules against constitutionally protected activity (e. g., assisting or being assisted by one another in legal matters in the absence of reasonable alternatives).

(b) In the event that disciplinary charges are filed, the applicable Department of Corrections policy statement provides for pre-hearing detention in "serious cases" only. It was formerly the official O.S.P. practice

to segregate only those charged with "major" offenses, as described in the employee manual. This practice was later changed by O.S.P. officials, and, thereafter, all inmates charged with any rule infraction(s) were automatically confined in segregation, prior to a hearing, in the punishment work gang lockup area located in New Cellhouse or the new jail in the West Cellhouse. Because the Disciplinary Committee usually met only once a week, inmates could routinely be held in segregation for up to six days without a hearing, regardless of the seriousness of the offense charged. Inmates have in fact been so held for up to six weeks before receiving their hearings.

(c) The Department of Corrections has published rules governing the procedures to be followed at disciplinary hearings. They do not require, however, that the disciplinary committee be comprised of disinterested persons. In practice, hearings have been and are held on occasion before committees with a member or members who have either brought the charges against the inmate or otherwise participated in the preparation or processing thereof.

(d) The official policy is to afford inmates a prehearing interview and an opportunity to appear and be heard at the hearing itself. Inmates are, however, denied the right to call witnesses on their own behalf or to confront and cross-examine adverse witnesses. No representation is provided by the institution and outside assistance from counsel or any other source is prohibited.

(e) There are no departmental rules, criteria or standards governing the type or duration of punishment which the disciplinary committee may impose for any given infraction. It has been the policy and practice at the penitentiary to impose indefinite sentences to the various lockup facilities. As a result of this practice, inmates have in fact often been held on punitive segregation for prolonged terms (which frequently reached six months to a year) under extremely harsh restraints and conditions.

(f) It is the written policy of the Department of Corrections to afford a weekly review of all persons on lockup by the Deputy Warden or his designee. The Standard to be applied and the procedures to be followed during these review sessions are not, however, set forth. In practice, there is no meaningful independent review by the Deputy Warden or other high-ranking, responsible administrative officer or panel. Instead, the responsibility for determining length of confinement has been abdicated to the correctional officers in charge of the individual lockups.

(g) The officer in charge of the Maximum Security Unit has been permitted to punish inmates summarily, without a hearing or any other procedural safeguards for conduct which takes place in the unit. Accordingly, inmates have had the minimal privileges afforded on M.S.U. further reduced for conduct deemed objectionable by the officers in charge. Similarly, inmates may be transferred to one of several isolation cells on M.S.U. at the sole discretion of the officer in charge, without any procedural safeguards other than the informal requirement that the Deputy Warden or chief of Security be notified.

14. Inmates confined in disciplinary lockup, particularly in the Maximum Security Unit, have been held for prolonged periods in close confinement. Exercise was limited to 15 minutes twice a week prior to the riot. Since that time all exercise was being denied as recently as the date of this trial. Sleeping accommodations consist of mattresses placed directly on the floor or on a concrete slab. There were and are no beds. The cells are vermin infested. Lighting throughout the lockup areas was and is inadequate.

The isolation cells have the same dimensions and fixtures as other M.S.U.

cells. They are, however, sealed off from the rest of the unit by a dividing wall. These isolation cells have only a small window or "bean hole" which can be closed to isolate the occupant completely and to seal out all light and ventilation. Such inmates receive no exercise, reading material or any other form of recreation.

Inmates who were sentenced to that form of disciplinary status officially referred to as "72 hour detention," were deprived of food, clothing, bedding and necessary hygienic materials and confined in cells generally known and commonly referred to as "hole" cells. These are totally dark and stripped of all fixtures other than latrines and faucets. Penitentiary officials published rules for such "72 hour detention," but there were no published departmental policies governing the use of these "hole" cells. Confinement in these "hole" cells was discontinued in the fall of 1972, pursuant to an unwritten administrative directive. The actual cells have been maintained and remain available in substantially the same condition as before for future use at any time this or any subsequent administration so decides.

*Administrative Lockup*

15. Prior to the riot, a large number of inmates were confined in administrative segregation on the top floor of the west cell house and on the top floor of the new cell house. Although some inmates were held in the administrative segregation areas for disciplinary punishment due to a lack of space in the maximum security unit, the majority were so held for a variety of reasons such as protection from other inmates, observation, investigation, awaiting court action and pre-hearing detention. These inmates had been convicted of no infractions or offenses and had been provided no hearings or other procedural safeguards. In spite of this, they were subjected to conditions of confinement which were punitive in nature. They were held in close confinement for prolonged periods with minimal lighting and ventilation. They received no exercise. Their privileges were restricted and they were denied the oportunity to participate in the prison work programs, to earn work time or to engage in any self-improvement programs. They were not considered for trusty status or parole eligibility. Following the riot, administrative segregation as previously practiced was dispensed with. Instead, through the process of custody grading and the 24 hour lockdown, essentially the entire prison population is now confined in administrative segregation under conditions which can still only be described as punitive. Inmates classified as "maximum custody," are not confined in the maximum security unit, and the first floor of East Cellhouse although they have been provided no disciplinary hearings. Inmates classified as "close custody" are now confined on the second and third floors of East Cellhouse. Inmates classified "medium custody" are confined on the fourth floor of East Cellhouse and throughout the West Cellhouse. A limited number of medium security inmates who have work assignments are also housed on the first floor of New Cellhouse. Inmates with different custody grades received different treatment. Those maximum custody inmates assigned to the maximum security unit receive the fewest privileges. At the other extreme are the medium custody inmates who have been afforded work privileges.

*Use of Chemical Agents*

16. The use of chemical mace and tear gas normally causes physical pain and discomfort and, on several occasions appearing in this record, the use of such chemical agents has caused serious physical injury and even death of inmates. Pursuant to his statutory authority, the Director of the Department of Corrections issued Policy Statement No. 7302.1 dated January 4, 1973, regarding the use of force including chemical agents at all Oklahoma Correctional Facilities. Under this policy, only such force was to be

employed as was reasonably necessary under all attendant circumstances. Definite guidelines ·for implementing the policy included the following:

(a) No person was to lay hands on a prisoner, except in self defense, to prevent an escape, to prevent injury to persons or damage to property, or to quell a disturbance. In controlling or moving an unruly prisoner, sufficient personnel were to be used to preclude the necessity for striking or inflicting bodily injury. Gas was not to be used on an individual prisoner except to prevent serious injury or loss of life. Accordingly, physical force was not to be used to force compliance with rules or regulations other than under the foregoing circumstances.

(b) When the use of force was necessary, it was to be exercised according to the priorities of force and limited to the minimum degree necessary under the particular circumstances. When firepower was utilized, the aim would be to disable rather than to kill. The application of any or all of the priorities of force listed below, or the application of a higher numbered priority without first employing a lowered numbered one, was dependent upon and required to be consistent with the situation encountered during any particular disorder. Priorities of force were:

1) Physical restraint;

2) Show of force;

3) Use of physical force other than weapons fire (Riot Squads);

4) Use of high pressure water;

5) Use of chemical agents;

6) Fire by selected marksmen;

7) Use of full fire power.

The policy statement required that whenever a chemical agent was used on an inmate and/or inmates, the Warden would immediately telephone the Director of the Department of Corrections or, in his absence, the Deputy Director of Institutions. The telephonic report was to be followed by a written report containing all facts and circumstances concerning the incident.

Notwithstanding these directives, the wardens and other high-level officials at the Oklahoma State Penitentiary at McAlester have approved or acquiesced in the use of chemical agents as a purely punitive measure against inmates, including even inmates locked in their cells, in violation of the limitations imposed by the Department of Corrections. Mace and tear gas have been used on inmates for such conduct as loud singing in cells, refusing to get haircuts or to shave, possession of contraband (such as instant coffee) in cells, destruction of state property (such as breaking plastic spoons), cursing an officer, talking in a loud voice or yelling, screaming for a doctor and shaking or rattling cell doors. None of the incidents discussed above were shown to have presented any real or immediate threat to the security of the institution and certainly did not rise to the level of threatening serious injury or loss of life. The Court finds as a fact that most, if not all, of these incidents were precisely the type of rules infractions concerning which the use of *any* type of physical force was intended to be prohibited by the departmental policy statement. They were, rather, incidents that should have been dealt with officially, if at all, by means of the use of the disciplinary system. Accordingly, it is clear that a pattern and practice exists of using chemical agents against inmates when inadequate (if any) consideration was given by the officials involved to the threshold question of whether a given situation warranted the use of any physical force at all, whether chemical agents or otherwise.

Chemical agents, such as mace and tear gas, have as an inherent characteristic the affecting of individuals other than those against whom they are specifically directed. This is a fact that has not been given adequate consideration by the defendants and their agents in determining whether such agents should be used in given situations. The record reveals incidents in which these various

chemical agents were used against disorderly inmates under appropriate circumstances, but in excessive amounts. The Court finds that while the use of chemical agents was not wholly unjustified, the manner and extent of their use was improper.

The record also reveals incidents in which chemical agents were used against specific individual inmates under circumstances justifying the use of physical force as a behavior control measure, but where other reasonable means of controlling the behavior of the specific inmates existed and where the chemical agents could not be used without visiting their effects on other, innocent inmates. The Court finds that the choice of chemical agents as the behavior control device in such instances was not justified.

The wardens and other high level officials at the penitentiary have routinely received reports of the improper use of chemical agents by correctional officers, but have failed and refused to take any corrective action. The Director of the Department of Corrections is either unaware of or condones the continued violations of the Department's policy, since the evidence of record reflects no action having been taken to seek to compel adherence to the limitations imposed by the Department's own regulations.

*Medical Care*

17. Defendants have maintained and operated a medical care delivery system at the Oklahoma State Penitentiary which was and is incapable of providing, has failed to provide, and continues to fail to provide adequate medical care for the inmates.

The medical staff and facilities which are located at the main penitentiary at McAlester are relied upon to diagnose and treat the medical, dental and psychiatric problems of inmates throughout the penitentiary system. Prior to the riot of July 27, 1973, the on-site medical staff, facilities, equipment and procedures at the Penitentiary are systemically incapable of meeting the routine or emergency health care needs of the inmate population. This facility and the equipment and records it contained were destroyed during the riot. A temporary hospital ward has been established in a former cellhouse and the security Captain's office is now used as an examination room. Portions of the medical research facility adjacent to the penitentiary have also been converted to use as an examination area for trustees. It is obvious, however, that those inadequacies in plant and equipment which existed prior to the riot were aggravated by the riot and that no effective solution has been formulated.

Professional dental care was supplied to the entire population by a series of part time dentists until July of 1973. Though a full time dentist was hired at that time, no trained civilian support personnel have been hired to assist him. This level of dental staffing is unable to meet the routine dental care needs of the population intended to be served. Indeed, even if there were two dentists and they were provided minimal paradental support, they could still only be expected to treat 50 percent of the dental pathology involved.

Though approximately one half of the average in-patient population at the penitentiary is hospitalized for psychiatric reasons, there is no professional psychiatric staff available for treatment on a regular basis. A visiting psychiatrist makes weekly visits pursuant to an informal agreement, but he has not assumed responsibility for the care of these patients. The only "treatment" available at the penitentiary consists of temporary relief from "distress" through sedation.

The professional medical staff available to the inmate male population at the time of trial consisted of one fully licensed, part-time M.D., serving as chief medical officer, and two additional doctors who have institutional licenses which permit them to practice in state institutions, but only under the supervision of a fully licensed physician. The

services of the institutional licensed physicians have been equally divided between health care of inmates and operation of the plasmaphersis program at the penitentiary so that the services of only one of them are normally available at any given time. The actual services supplied by the chief medical officers have varied. The chief medical officer at the time of the riot was supplying full time services. Since his resignation, only part-time services are provided by his successor, Dr. Karl Sauer, who also maintains an active, private orthopedics practice in McAlester. Part of Dr. Sauer's time at the penitentiary is required to be spent on administrative matters.

For many years, the penitentiary system has, for all practical purposes, been without any professionally trained medical support personnel whatsoever. Due to shortages in staff, defendants have continuously relied on unlicensed, untrained and unqualified correctional officers and other penitentiary employees, as well as inmate personnel, to perform clinical and related medical services which should be performed solely by licensed and qualified professionals. Such services performed by unqualified inmate and civilian personnel include, for example, screening medical complaints to determine which inmates on sick call will actually get to see a doctor, as well as providing actual treatment and nursing care. Subsequent to the riot, defendants have placed even greater reliance on such unqualified personnel at the main facility where almost the entire inmate population was being held on 24 hour lockdown as recently as the time of this trial. The lockdown has in fact seriously exacerbated previously existing problems in the medical area.

Defendants have endeavored, both before and since the riot, to supply some medical services by referrals to various outside facilities. This system of referrals, however, has failed to compensate for on-site deficiencies in staff and facilities and does not and cannot adequately meet the medical needs of the inmates.

The past and present systemic medical deficiencies at O.S.P. have resulted in instances of actual impairment of inmate health and continue to pose an actual and potential threat to the physical health and well-being of the O.S.P. inmate population.

*Correspondence Rights*

18. Defendants have engaged in a pattern and practice of arbitrary and unreasonable restriction, interruption and delay of mail to and from inmates at the Oklahoma State Penitentiary.

Defendants have unduly restricted the inmates' opportunity to conduct sealed or privileged correspondence with counsel, the courts and other governmental agencies. Incoming sealed correspondence has never been permitted from any source and, until quite recently, all such incoming mail was opened and read. Outgoing sealed correspondence with attorneys, other than the correspondent's single "attorney of record," and to federal courts and government officials has also been denied privileged treatment, even after defendants purported to recognize limited "privileged" correspondence on or about February 2, 1973. Accordingly, at least some letters to and from courts, attorneys and government agencies continued to be opened, read, copied, recorded, and/or rejected. Furthermore, defendants' policy on privileged correspondence was never fully implemented. In apparent contravention of that policy, the established practice of officers in charge of the various lockup facilities at the penitentiary was to deny any sealed correspondence privilege to their charges.

An additional barrier to the confidentiality of such correspondence has been the failure to provide notary services within the secured areas of the pentitentiary. Accordingly, legal documents which required notarization could not be sealed by the inmates, inasmuch as they were required to turn these matters in for notarizing, which was effected outside their presence.

At the supplemental pretrial conference held on December 6, 1973, counsel for the defendants tendered to the Court and opposing counsel a new Department of Corrections policy statement governing inmate correspondence. Implementation of the policy statement was not undertaken until very recently and the record is unclear as to the exact manner in which the new policy has been applied in practice. On its face the document permits sealed out-going correspondence without restrictions. All incoming mail is still to be opened. Only inspection for impermissible enclosures is expressly authorized, but reading is not actually prohibited. Any inspection is required to be conducted in the presence of the inmate addressee, if the mail is from an attorney. This procedure is expressly extended to inmates on lockup or "segregated" status.

Under the new policy no privilege is recognized with respect to mail from courts and government officials. There is no provision for solving the problem on confidentiality of outgoing mail requiring notarization. Moreover, any inmate whom unidentified officials determine has violated "certain imposed guidelines" will apparently be reduced to the limited opportunity to conduct sealed correspondence, as recognized under the old policy.

The new mail policy also eliminates a number of restrictions formerly applied to unprivileged mail. Prior to and during most of the time this case has been pending, defendants severely restricted personal correspondence to five immediate family members, as approved by the penitentiary classification office. No other "personal" correspondence was allowed. Mail of a non-personal nature was permitted, but only if the inmate's classification officer made a determination that the particular communication was of a "business" nature. No written rules or guidelines defining "business" mail were ever established or made available either to the inmates or to the employees who were required to make such evaluations. In practice, classifica-

tion officers exercised this undefined authority in a manner that rejected letters to and from ministers, attorneys, government officials and other similar correspondents.

Under the new mail policy, inmates may not correspond with outside businesses or institutions for the purpose of soliciting catalogues, fee samples or educational material, or for the purpose of conducting their own business. Regardless of purpose, they may not conduct any correspondence with persons known to them only through newspaper or magazine ads, or with persons in prison who are not immediate family members. There is a separate departmental policy statement governing the practice of religion which prohibits inmates from communicating with ministers who are ex-convicts.

In addition to the foregoing expressed limitations, evidence in the record shows that certain inmates have not been permitted to correspond with a San Francisco, California, prisoner aid group, believed by the inmates to be a possible source of legal services. There is no indication of change in defendants' continuous, but unwritten, policy of prohibiting correspondence of any kind in a foreign language.

As indicated above the new policy authorizes inspection, but neither authorizes nor prohibits the reading of incoming mail. On the other hand, there was never any express authority to read inmate mail under the prior policy. Nevertheless, the actual practice at the penitentiary routinely involved the reading of inmate mail for the purpose of discovering and rejecting mail containing "gossip" and "improper language." There was no expressed policy, purpose, direction or standards for such censorship, so the employees authorized to censor such mail did so on an entirely subjective basis.

*Publications*

19. Defendants have in the past prohibited and continue to prohibit inmate

subscriptions to, receipt and/or possession of certain magazines and newspapers.

In the past, the official written rule was that subscriptions could be obtained to any periodicals on the approved periodical list. In fact, such a list did not exist. Decisions on individual requests to subscribe to various periodicals were made on a case-by-case basis, by penitentiary personnel, guided by essentially no promulgated standards or procedures.

After the riot, a practice was instituted that prevented inmates from subscribing to any newspapers or periodicals. Quite recently, there has actually been promulgated an approved periodicals list. As will be set forth in greater detail, this list still operates to exclude legal and religious periodicals. No procedure has been promulgated whereby inmates may seek to obtain approval for subscriptions to periodicals not on the approved list. In fact, they have been advised that all periodicals not on the list are contraband. The Court takes judicial notice that innumerable publications containing protected speech have not been included on the current approved list.

### Access to the Courts

20. The defendants have failed to provide an adequate law library or any reasonably and adequate alternative thereto. The library, such as it is, is located in a wood frame shelter attached to the wall of the main rotunda. Because of its size, approximately ten feet by six feet, only two or, at most, three inmates can use the facility at any one time. The facility is so lacking in legal reference books and publications as to constitute no library at all. For example there are no reports of decisions by the United States Supreme Court or lower Federal Courts.

Inmates are prohibited from assisting one another on legal matters and in preparing their legal papers since such assistance may permissibly be provided only by a law librarian. In practice, penitentiary officials have also followed a policy of preventing inmates from acquiring legal books. In addition, inmates have been and are now prohibited from subscribing to any legal periodicals and have been denied the right to have in their possession any personal legal materials or other assets belonging to them and acquired for the purpose of working on their legal problems, although the latter prohibition has recently been relaxed.

For extended periods of time, the law library has been closed to inmates because no librarian was available. It is noted that during the year 1973, except for approximately six weeks, no law librarian was employed by the penitentiary. During such periods an inmate could use the library only if a classification officer was available to accompany him and to and open the library for him. Approximately 15 percent of the inmate population is illiterate and the sixth or seventh grade average reading ability of the population is less than that which is required for effective use of the more common legal reference materials. As is noted above, only the institutional "law librarian" may permissibly assist these and other inmates on legal matters. The use of the term "law librarian" is misleading since no librarian employed by the penitentiary has had any legal training. When such a librarian has been available he has been able to assist only three or five inmates per day. Inmates frequently must wait up to five weeks to receive assistance, if it is available at all. Inmates on lockup, regardless of the length of confinement, are prohibited from using the law library. They are only provided with legal forms which may be used to file ·petitions with the courts. Male inmates from subsidiary facilities must request transfers to the main facility at McAlester in order to use the library facilities. Women inmates are afforded no library privileges and must depend upon visits from the law librarian, when one is employed and is available. Recently a new employee was hired to perform the func-

tions of a law librarian. This employee is classified as a correctional officer I, but due to illness, has been unavailable for some time. It is heartening to note from the record that the defendants have made plans for upgrading the law library facilities, employing a full-time attorney and engaging the services of law students to provide legal assistance to inmates. However, such plans have not as yet been implemented and the conditions mentioned above still prevail.

### Religious Freedom

21. Inmates at the Oklahoma State Penitentiary who follow the Muslim faith do not, because of their religious beliefs, eat pork or any food mixed with pork or pork by-products. Said inmates have on numerous occasions petitioned penitentiary officials to provide them with pork free meals. Penitentiary officials have refused and still refuse to provide the pork free meals so requested. Defendants have failed to provide special diets, even when requested by the medical staff for medical patients, and nutritional analyses of penitentiary menus show that there are vitamin and protein deficiencies in the diet generally provided inmates.

It is common knowledge that many meals are prepared with pork or pork by-products. However, the Court cannot determine with specificity, from the menus placed in the record, the extent to which pork or pork by-products are used in the food now served to the inmates. Of course, pork served in its natural state is easily discernible, but meals seasoned with pork are often difficult of detection. The record is devoid of any evidence indicating that inmates are advised of foods actually prepared with pork or pork by-products. It naturally follows that those inmates whose religious beliefs prevent the eating of pork in any form, are often forced either to chance that the food they eat is free of pork or to refuse the food altogether. Because of the dietary deficiencies found to exist in the regular meals now being prepared and served to all in-

mates, the Court finds that inmates who follow the Muslim teachings cannot obtain an adequate diet by foregoing the eating of food prepared with pork and will, if they attempt to follow the tenets of their faith, receive a diet even more deficient than that received by other prisoners.

Muslim inmates have also been deprived of the oppportunity to gather together for group religious services. It is unclear for what periods this condition prevailed prior to the riot, since there is evidence in the record that some arrangement for such meetings had been made through the auspices of the Catholic Chaplain. Subsequent to the riot, there has been a total ban on group religious services regardless of denomination. This prohibition appears to have had a greater impact on the Muslims, because such services provide their only opportunity for religious guidance. Protestants and Catholics at the penitentiary have at least the services of a civilian chaplain with whom individual consultations may be arranged however brief or unsatisfactory they may be.

Religious periodicals have not been included on the various official and unofficial approved periodical lists that have been in effect at the penitentiary at diverse times. Moreover, Muslim publications entitled "Elijah Muhammad Speaks" and "The Message to the Black Man in America" have been and are specifically prohibited by a departmental policy statement dated April 25, 1968. No factual justification for the exclusion of these two specific publications is shown. Likewise, no justification whatsoever is shown for the failure to include religious publications generally on the various approved periodicals lists.

Members of the Muslim sect at McAlester have earnestly urged this Court that their religious principles have been offended by their integration with non-Muslim inmates. For the reasons set forth in the Court's discussion of racial integration this aspect of the Muslim complaint will not be honored and must be rejected.

It is also claimed that none of the guards presently employed at the penitentiary are followers of Muslim faith. The Court has no reason to doubt this assertion, but finds no evidence that this condition has been the result of or has resulted in any direct or covert discrimination based upon religion or race.

Finally, the Muslim plaintiffs have complained that following the July 27 riot, they were locked up because of their religious beliefs. The Court notes that the entire population at McAlester was and continues to be locked up under punitive conditions which it finds deplorable. There is, however, no evidence that Muslims, because of their beliefs, have been subjected to conditions or restrictions more punitive than other inmates of the Penitentiary.

*Prior Findings of this Court*

The trial in this case was heard on March 14, and 15, 1973, following a series of individual *pro se* cases presented to the court during the week of March 11. At the close of this trial, the Court entered a series of preliminary findings which dealt in general terms with the numerous unconstitutional conditions and practices which have been described in greater detail herein. The Court further found from the totality of the record, that plaintiff as well as the other inmates at McAlester are entitled to such injunctive and mandatory relief, as is necessary to correct the deprivations of rights which have occurred in the past and will continue unless enjoined by order of this Court.

The requests for additional relief were, however, denied because of evidence of contributing fault on the part of inmates. Accordingly, it was and is the determination of this Court that the record does not support the award of money damages to any prisoner nor is there evidence which would warrant the release of any prisoner from confinement prior to serving his full sentence.

*Conclusions of Law*

*Jurisdiction*

1. This Court has jurisdiction of this case. 28 U.S.C. § 1343(3) & (4).

2. The Attorney General of the United States was authorized to intervene in this action on behalf of the United States pursuant to Section 902 of the Civil Rights Act of 1964, 42 U.S.C. § 2000h–2.

3. "Federal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons,' which include prisoners. We are not unmindful that prison officials must be accorded latitude in the administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations. But persons in prison, like other individuals, have the right to petition that Government for redress of grievances. . . ." Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). While federal courts are "reluctant to intervene in matters of prison administration," Hoggro v. Pontesso, 456 F.2d 917 (C.A. 10, 1972), the record in this case has led this Court to conclude that the defendants have been and are operating the Oklahoma State Penitentiary in a manner which violates many rights secured to inmates by the Constitution and laws of the United States. "[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights. Johnson v. Avery, 393 U.S. 483, 486, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)." Procunier v. Martinez, —— U.S. ——, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974).

*Racial Discrimination and Segregation*

4. A state policy or practice of racial segregation in the operation of detention facilities violates the equal

protection clause of the Fourteenth Amendment. Washington v. Lee, 263 F.Supp. 327 (N.D.Ala.1966), aff'd; Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); Wilson v. Kelley, 294 F.Supp. 1005 (N.D.Ga.1968) aff'd 393 U.S. 266, 89 S.Ct. 477, 21 L. Ed.2d 425 (1968). Racial segregation of correctional facilities cannot be justified on the basis that integration may result in inmate violence. United States v. Wyandotte County, 480 F.2d 969 (C. A. 10, 1973) (per curiam); cert. denied 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973); McClelland v. Sigler, 327 F.Supp. 829 (D.Neb.1971) aff'd, 456 F. 2d 1266 (C.A. 8, 1972) (per curiam).

■■ 5. The equal protection clause of the Fourteenth Amendment prohibits racial discrimination in any aspect of prison administration. Privileges must be afforded equally to prisoners of all races. Rivers v. Royster, 360 F.2d 592 (C.A. 4, 1966); Jackson v. Godwin, 400 F.2d 529 (C.A. 5, 1968); Owens v. Brierley, 452 F.2d 640 (C.A. 3, 1971). Specifically, prison officials may not discriminate on the basis of race when making job assignments or administering discipline. Gates and United States v. Collier, 349 F.Supp. 881, 901 (N.D.Miss., 1972) (appeal pending).

■ 6. The present cessation of segregation in inmate housing coming subsequent to the filing of a lawsuit due to emergency conditions beyond defendants' control is insufficient grounds upon which to conclude there is "no reasonable expectation that the wrong will be repeated." N. L. R. B. v. Raytheon Co., 398 U.S. 25, 27, 90 S.Ct. 1547, 1549, 26 L.Ed.2d 21 (1970); United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

In light of the prolonged practice of segregation prior to the riot in contravention of stated policy, and because of the uncertainty of post-riot conditions and the importance of the rights at stake, judicial relief continues to be both appropriate and necessary. Rowe v. General Motors Corp., 457 F.2d 348 (C.

A. 5, 1972); United States v. West Peachtree Tenth Corp., 437 F.2d 221, 228 (C.A. 5, 1971).

*Procedural Due Process*

■ 7. The due process clause proscribes any serious disciplinary sanctions against an inmate unless he is found to have violated written rules which are adequately promulgated prior to the commission of the infraction charged and which describe punishable conduct with reasonable precision. Sinclair v. Henderson, 331 F.Supp. 1123 (E.D.La.1971); Gates and United States v. Collier, 349 F.Supp. 881 (N.D.Miss. 1972) (appeal pending).

■ 8. Summary punishment is unconstitutional; serious disciplinary sanctions may not be imposed on inmates without a hearing. Inmates who are charged with infractions must be given official written notice of the specific charges against them. This notice must be given a reasonable time prior to conducting the hearing. Sinclair v. Henderson, *supra*; Sostre v. McGinnis, 442 F.2d 178 (C.A. 2, 1971); Nolan v. Scafati, 430 F.2d 548 (C.A. 1, 1970); Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); see also, Black v. Warden, 467 F.2d 202 (C.A. 10, 1972).

■ 9. The determination to impose serious disciplinary sanctions on prisoners must be made by an impartial decision-maker Sostre v. McGinnis, 442 F.2d 178 (C.A. 2, 1971), cert. denied sub nom. Sostre v. Oswald, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972).

■ 10. The impartial disciplinary tribunal may not in effect abdicate sentencing responsibility by permitting line officers to determine the length of confinement. Accordingly, a denial of procedural due process results where indefinite lockup sentences are imposed without a regular, meaningful and independent review reasonably designed to enable the disciplinary tribunal or some other responsible disinterested administrative official or body to make its own

determination regarding duration of confinement.

See, Adams v. Carlson, 488 F.2d 619 (C.A. 7, 1973); Gray v. Creamer, 465 F.2d 179 (C.A. 3, 1972); United States ex rel. Walker v. Mancusi, 467 F.2d 51 (C.A. 2, 1972).

▮ 11. The imposition of significant additional restrictions or sanctions on inmates who have already been placed on disciplinary lockup requires the same procedural safeguards as apply at the time of the original punishment. Adams v. Carlson, *supra*; Palmigiano v. Baxter, 487 F.2d 1280, 1284–1285 (C.A. 1, 1973).

▮ 12. Automatic detention of inmates prior to disciplinary hearings can result in a denial of procedural due process. Whether awaiting institutional or judicial proceedings or both, such inmates should be segregated only if a reasonable basis exists therefore (*e. g.*, their continued presence in general population status poses an actual threat to the security of the institution) and then only for a reasonable time until the disciplinary committee can convene to hear the case. The pre-riot practice at the Oklahoma State Penitentiary of having the disciplinary committee meet weekly is not an adequate one for this purpose. Such hearings must be held as soon as is practicable under the circumstances. Absent unusual and reasonably sufficient extenuating circumstances, pre-hearing detention in excess of 48 hours (72 hours if a weekend intervenes) is presumptively unreasonable. Landman v. Royster, 354 F.Supp. 1292, 1294 (E. D.Va.1973).

▮ 13. Even where the confinement of an inmate under punitive conditions is denominated and processed as an administrative, rather than a disciplinary matter, the indefinite confinement of inmates under such conditions, without standards or criteria, and without minimal procedural safeguards, violates the due process clause of the Fourteenth Amendment. United States ex rel. Walker v. Mancusi, D.C., 338 F.Supp.

311, affirmed, 467 F.2d 51 (C.A. 2, 1973); Adams v. Carlson, 488 F.2d 619 (C.A. 7, 1973); Gray v. Creamer, 465 F.2d 179 (C.A. 3, 1973); Howard v. Smyth, 365 F.2d 428 (C.A. 4, 1966); Diamond v. Thompson, 364 F.Supp. 659 (M.D.Ala.1973); Allen v. Nelson, 354 F.Supp. 505 (N.D.Cal.1973); Bowers v. Smith, 353 F.Supp. 1339 (D.Vt.1972).

*Cruel and Unusual Punishment*

a. *In General*

▮ 14. The prohibition against cruel and unusual punishment in the Eighth Amendment is applicable to the State of Oklahoma through the due process clause of the Fourteenth Amendment. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

▮ 15. It is established that the Eighth Amendment does not have fixed, settled and definite limits. The "Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 100–101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). This Court subscribes to the view of the Eighth Circuit:

> "In summary, then so far as the Supreme Court decisions are concerned, we have a flat recognition that the limits of the Eighth Amendment's proscription are not easily or exactly defined, and we also have clear indications that the applicable standards are flexible, that disproportion, both among punishments and between punishment and crime, is a factor to be considered, and that broad and idealistic concepts of dignity, civilized standards, humanity, and decency are useful and usable."

Jackson v. Bishop, 404 F.2d 571, 579 (C.A. 8, 1968). In short, the parameters of the constitutional prohibition are not rigidly defined and are, in effect, discernible only in the context of specific factual situations.

▮ 16. "Cruel and unusual punishment may be inflicted by the uncon-

scionable penalty imposed by statute or by the inhumane execution of a permissible penalty imposed under a constitutionally permissible statute." Bethea v. Crouse, 417 F.2d 504, 507–508 (C.A. 10, 1969). While the great majority of cases involving the Eighth Amendment have involved one or more specific acts directed at selected individuals (e. g., Trop v. Dulles, *supra*), the constitutional prohibition is equally applicable to general conditions of confinement. Holt v. Sarver, 309 F.Supp. 362, 372–373 (E.D. Ark.1970), aff'd 442 F.2d 304 (C.A. 8, 1971); Landman v. Royster, 333 F. Supp. 621 (E.D.Va.1971); Gates and United States v. Collier, 349 F.Supp. 881 (N.D.Miss.1972) (appeal pending).

### b. *Use of Chemical Agents*

17. Chemical mace and tear gas inevitably inflict physical pain and discomfort upon, and can cause permanent physical injury and even death to the individual(s) against whom they are used. Accordingly, the use of such chemical agents to punish inmates constitutes a form of corporal punishment.

18. At least in a State such as Oklahoma where State law clearly proscribes the use of corporal punishment, Title 57 O.S.A. § 31, the use of corporal punishment on inmates is also cruel and unusual within the meaning of the Eighth Amendment.

19. Whether or not proscribed by State law, the use of chemical agents such as mace or tear gas as a punitive measure rather than a control device results in the imposition of cruel and unusual punishment in violation of the Eighth Amendment. Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971). See also Morales v. Turman, 364 F.Supp. 166, 173 (E.D.Tex.1973) (involving Texas juvenile detention facilities).

20. That chemical agents have been used as a punitive measure may be inferred from evidence showing that such agents are employed unnecessarily (i. e., without proper justification based on a reasonable concern for the security of the institution) or with justification, but in excessive amounts. See Landman v. Royster, *supra*.

21. The established pattern of unreasonable and excessive use of chemical agents at the Oklahoma State Penitentiary has resulted in summary, as well as cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

### c. *Conditions of Confinement*

22. Solitary confinement *per se* does not constitute cruel and unusual punishment. Novak v. Beto, 453 F.2d 661 (C.A. 5, 1971); Graham v. Willingham, 384 F.2d 367 (C.A. 10, 1967). Such confinement may constitute cruel and unusual punishment, however, if it is maintained in a manner fairly characterized as foul, inhuman and violative of basic concepts of human decency, Wright v. McMann, 387 F.2d 519, 526 (C.A. 2, 1967). In most of the cases in which the conditions in solitary confinement have been condemned, the inmates were held in dark cells where personal hygiene was impossible due to the lack of materials necessary for personal sanitation and/or the inability to properly dispose of body waste. See e. g., LaReau v. MacDougall, 473 F.2d 974 (C.A. 2, 1972) cert. denied, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); Wright v. McMann, supra; Hancock v. Avery, 301 F.Supp. 786 (M.D.Tenn. 1969); Jordan v. Fitzharris, 257 F. Supp. 674 (N.D.Cal.1966). Such conditions have prevailed in the subterranean isolation area referred to as "the hole." The conditions found to exist in the isolation cells in the maximum security unit approach, but do not, standing alone, reach the level of cruel and unusual punishment. Nevertheless, confinement in dark, unventilated and unsanitary isolation cells without any means of mental or emotional diversion if imposed for prolonged periods will result in conditions which equal cruel and unusual punishment. See, Morales v. Turman, 364 F.Supp. 166 (E.D.Tex.1973). Cf. Novak v. Beto, 453 F.2d 661, 671 (C.A. 5,

1971) (partial dissenting opinion); Sostre v. McGinnis, 442 F.2d 178 (C.A. 2, 1971) cert. denied sub nom. Sostre v. Oswald, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972).

■ 23. Prisoners held in segregation for security or other non-disciplinary reasons must be provided as many of the privileges enjoyed by the general population as the nature of their confinement allows. Landman v. Royster, 354 F.Supp. 1292, 1294–1295 (E.D.Va. 1973); Allen v. Nelson, supra.

■ 24. Where inmates are confined to their cells for periods up to one year and subjected to continual and enforced idleness without affording them any opportunities for physical exercise, voluntary work, or educational programs, it must be concluded that such conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment. Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark., 1971); Sinclair v. Henderson, 331 F. Supp. 1123 (E.D.La.1971); cf. Osborn v. Manson, 359 F.Supp. 1107 (D.Conn. 1973).

### d. Denial of Medical Care

■ 25. Inmates have a basic right to receive needed medical care while they are confined in prison. Edwards v. Duncan, 355 F.2d 993 (C.A. 4, 1966); Coppinger v. Townsend, 398 F.2d 392 (C. A. 10, 1968); Schack v. Florida, 391 F. 2d 593 (C.A. 5, 1968), cert. denied, 392 U.S. 916, 88 S.Ct. 2080, 20 L.Ed.2d 1376 (1968); Martinez v. Mancusi, 443 F.2d 921 (C.A. 2, 1970); Sawyer v. Sigler, 320 F.Supp. 690 (D.Neb.1970), aff'd 445 F.2d 818 (C.A. 8, 1971).

■ 26. As a necessary corollary of that right, prison officials have an affirmative duty to make available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates. Fitzke v. Shappell, 468 F.2d 1072 (C.A. 6, 1972); Campbell v. Beto, 460 F.2d 765 (C.A. 5, 1972); Gates and United States v. Collier, 349 F.Supp. 881 (N.D.Miss.1972) (appeal pending); Newman v. Alabama, 349 F.Supp 278 (M.D.Ala.1972) (appeal pending); cf. Jones v. Wittenberg, 330 F.Supp. 707 (N.D.Ohio, 1971) affirmed sub nom. Jones v. Metzer, 456 F.2d 854 (C.A. 6, 1972); Chapman v. Gilligan, No. 8700 (S.D.Ohio, March 16, 1973). While a prisoner is not entitled to the medical care of his choice, Coppinger v. Townsend, supra, Judge Daugherty has held that "a failure to provide needed medical care by one having custody of a prisoner may under certain circumstances afford a prisoner a cause of action under Civil Rights Act." (Elsberry v. Haynes, 256 F.Supp. 738 (W.D.Okl.1966).

■ 27. The actionable circumstances result where, as here, the level of medical care available to a confined and dependent population is inadequate to meet predictable health care needs because of obvious and sustained deficiencies in professional staff, facilities and equipment. When continued and systemic deficiencies of this nature exist and have resulted in the actual impairment of inmate health, and when such deficiencies continue to pose a current and potential threat to the physical health and wellbeing of an entire prison population, then inmates are deprived of the basic elements of adequate medical treatment in violation of the Eighth Amendment, Campbell v. Beto, supra, and are also subjected to disabilities beyond those contemplated by incarceration, in violation of the due process clause of the Fourteenth Amendment. Fritzke v. Shappell, supra.

### Correspondence and Publication

■ 28. Inmates have a preferred constitutional right to correspond with attorneys, courts and government officials for the purpose of petitioning government and the courts for the redress of grievances. LeVier v. Woodson, 443 F.2d 360 (C.A. 10, 1971); Sostre v. McGinnis, 442 F.2d 178 (C.A. 2, 1971) cert. denied sub nom. Sostre v. Oswald, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); Palmigiano v. Travisono,

317 F.Supp. 776 (D.R.I.1970). The confidentiality of such correspondence may not be arbitrarily denied by prison officials, who are the likely subjects of an inmate's grievances. Defendants' practice of limiting confidential treatment to correspondence with one attorney, state courts and state government officials, but not with their federal counterparts, constitutes an arbitrary and unreasonable intrusion upon the inmates' right freely to petition their government and the courts. See, Palmigiano v. Travisono, *supra*..

29. This Court does not conclude that prison officials may not regulate or restrict forms of prisoner mail. Because of its impact on the First Amendment rights of "freeworld" as well as inmate correspondents, however, the censorship of such mail must meet the constitutional standards which are generally applied to governmental regulation of protected speech. Accordingly, it must be shown that prison mail censorship furthers an important governmental interest unrelated to the suppression of speech and that the mode of censorship results in limitations which are no greater than are necessary or essential to the protection of the particular governmental interest involved. Procunier v. Martinez, —— U.S. ——, 94 S. Ct. 1800, 40 L.Ed.2d 224 (1974); United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Prison mail regulations which automatically limit inmates to personal correspondence with a fixed number of immediate family members work an arbitrary and unconstitutional prior restraint on the protected speech of both inmates and their "freeworld" correspondents. Such overly broad restrictions have been imposed on inmates of the Oklahoma State Penitentiary solely to serve the administrative convenience of the defendants, without furthering any demonstrated interest in the orderly operation of the institution or the rehabilitation of its inmates. Procunier v. Martinez, *supra*; Morales v. Schmidt, 489 F.2d 1335 (C. A. 7, January 17, 1973) (rehearing en banc, May 29, 1973, 494 F.2d 85); Le-Mon v. Zelker, 358 F.Supp. 554 (S.D.N.Y. 1972).

30. Defendants' policy of intercepting, censoring and rejecting incoming and outgoing inmate correspondence based on unwritten and/or ill-defined prohibitions against "improper language" or "gossip" including "false statements to any correspondents" is overbroad on its face and has in fact been applied in such a manner as to infringe upon the protected speech of inmates and their "freeworld" correspondents. Procunier v. Martinez, *supra*; Adams v. Carlson, 352 F.Supp. 882 (E.D.Ill.1973) reversed in part on other grounds, 488 F.2d 619 (C.A. 7, 1973); *cf.* LeMon v. Zelker, *supra*; Palmigiano v. Travisono, supra.

31. Whether based upon the identity or characteristics of the correspondents (as in the case of approved list restrictions), or upon the content of their specific communications (such as "gossip" and "improper language"), the restriction and/or censorship of prison mail deprives both inmates and their "freeworld" correspondents of the "liberty" of free speech. Accordingly, due process requires that the determination to censor must be based on facts rationally determined pursuant to such procedures as are necessary to insure fairness. Such minimum procedural safeguards include notice to the interested correspondent(s) and a reasonable opportunity to protest the decision of a prison official other than the person who originally disapproved the correspondence. Martinez v. Procunier, D.C., 354 F.Supp. 1092, affirmed, Procunier v. Martinez, *supra*.

32. Restrictions on the free flow of information to prison inmates in the form of general circulation newspapers and magazines results in a denial of the First Amendment rights of such inmates, unless the State can show that such restrictions are reasonably necessary to the preservation of security, good order or discipline within the

penitentiary or the rehabilitation of the inmates. Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D.N.Y.1970); Laaman v. Hancock, 351 F.Supp. 1265 (D. N.H.1972). The past and present restrictive practices of the defendants, pertaining to the acquisition and retention of general circulation newspapers and magazines have gone far beyond any possible legitimate needs based on the preservation of security, good order or discipline within the penitentiary or the rehabilitation of the inmates. Such rules that have existed and such practices as have been in effect have been arbitrary and capricious on their face and as applied. The legitimate interest of inmates in having access to the information, both social and educational, to be found in these various types of periodicals far outweighs any legitimate interest of penal administration or any proper regard to be afforded the expertise and discretionary authority of competent correctional officials. When prison officials conclude that effective security, good order or rehabilitation require the censorship of such material, then with respect to each objectionable publication, the basis for the determination, including a written notice setting forth the relevant facts with respect to the particular publication, shall be provided to each inmate who seeks to obtain it. Such inmates shall be provided a reasonable opportunity to submit additional facts and views to the decision maker before such determination becomes final. *Laaman, supra*; Sostre v. Otis, 330 F.Supp. 941 (S.D.N.Y.1971); See Procunier v. Martinez, *supra*. If it is possible to do so without defeating the purpose of the proposed exclusion, the inmate should be allowed to examine the allegedly offensive material and set forth reasons in writing as to why he feels it should not be excluded. In any event, the actual, final decision to exclude a specific issue of any general circulation publication shall be made by the Warden or Deputy Warden, who shall prepare and retain on file a detailed statement of the specific basis for each such exclusion for any jurisdictional court review.

### Access To The Courts

■ 33. Prisoners, no less than other persons, have a constitutional right of access to the courts. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L. Ed.2d 718 (1969). " 'Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid.' Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L. Ed.2d 1034 (1941)." Procunier v. Martinez, *supra*.

■ 34. To be meaningful, the right of access to the courts must include the means to frame and present legal issues and relevant facts effectively for judicial consideration.

■ 35. Because the state has substantial control over the activities of convicted prisoners and because many prisoners are indigent and poorly educated, prison officials have an affirmative constitutional duty to provide them with the necessary means for obtaining access to courts.

Prison law libraries are a basic means of assisting inmates to that end. Gilmore v. Lynch, 319 F.Supp. 105 (N.D. Cal.1970), affirmed, Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971); Hooks v. Wainwright, 352 F. Supp. 163 (M.D.Fla.1972). The defendants have, at various times and in various ways, attempted to provide some form of legal assistance to inmates. The Court concludes however that the law library and legal assistance program at the Oklahoma State Penitentiary have failed to provide these disadvantaged inmates with constitutionally adequate access to the courts. Johnson v. Avery *supra*; Gilmore v. Lynch, *supra*; Hooks v. Wainwright, *supra*.

"The constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to

challenge unlawful convictions *and to seek redress for violations of their constitutional rights."* Procunier v. Martinez, supra. (emphasis added). Accordingly, the Court concludes that the requirement levied on the State of Oklahoma in this area of constitutional application extends to insuring adequate access to the courts regarding at least habeas corpus actions, civil rights actions under 42 U.S.C. § 1983 and out-of-time appeals. *Cf.* Justice After Trial: Prisoners' Need for Legal Services in the Criminal Correctional Process, 18 Kan.L.Rev. 493 (1970).

■ 36. A state may not prohibit inmate self-help or mutual inmate assistance in legal matters unless it provides them with some reasonable, alternative means of protecting their right of access to the courts. Johnson v. Avery, *supra.* Defendants in this case have unconstitutionally interfered with inmates' protected attempts to obtain timely, effective access to the courts in numerous ways. This unconstitutional interference has extended to attempts by inmates to seek and receive the assistance of attorneys, Procunier v. Martinez, *supra*; to acquire, retain and use personal legal materials such as law books, legal periodicals, and such other assets as are used in the course of working on one's personal legal problems, Cruz v. Hauck, 404 U.S. 59, 92 S.Ct. 313, 30 L.Ed.2d 217 (1971), Adams v. Carlson, 488 F.2d 619 (C.A. 7, 1973), and to assist one another in the preparation of legal documents in the absence of a constitutionally adequate alternative. Johnson v. Avery, *supra*; See also, Procunier v. Martinez, *supra.*

*Religious Freedom*

■ 37. Where the precepts of a religious sect call for its adherents to engage in a religious practice which does not present a threat to the security, discipline and good order of the institution, the state has the burden of justifying policies or practices which prevent such inmates from engaging in such religious practices. See, Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Long v. Parker, 390 F.2d 816 (C.A. 3, 1968); Brown v. Peyton, 437 F.2d 1228 (C.A. 4, 1971).

■ 38. The court finds no valid justification for defendants continuing policy of denying inmates including Muslims the opportunity to gather together for corporate religious services. Walker v. Blackwell, 411 F.2d 23 (C.A. 5, 1969); Long v. Parker, 390 F.2d 816; Northern v. Nelson, 315 F.Supp. 687 (N.D.Cal.1970); affirmed, 448 F.2d 1266 (C.A. 9, 1971); Banks v. Havener, 234 F.Supp. 27 (E.D.Va.1964); Williford v. California, 352 F.2d 474 (C.A. 9, 1965).

■ 39. In the instant case, the defendants have not offered any justification to support their food distribution practices which prevent Muslim inmates from adhering to their religious practice of abstaining from the consumption of pork and pork by-products. Such practices cannot be squared with the First Amendment rights of the inmates and, on the basis of the record in this case, are an unconstitutional application of state power. See, Barnett v. Rodgers, 133 U.S.App.D.C. 296, 410 F.2d 995 (1969).

■ 40. In order to justify a proscription against religious publications, including Muslim literature, officials have the burden of showing that such publications present a threat to security, discipline and good order within the institution that cannot otherwise be overcome. Rowland v. Jones, 452 F.2d 1005 (C.A. 8, 1971); Brown v. Peyton, *supra*; Long v. Parker, *supra*. In the instant case no such showing has been made with respect to the prohibited publications entitled "Message to the Black Man" and "Muhammad Speaks."

*Relief*

■■ 41. It is within the authority and is indeed the responsibility of this court to order that all violations of federal constitutional and civil rights,

and of rights and privileges secured by the laws, regulations and policies of the State of Oklahoma, cease forthwith. The Court is loath to consider the necessity of closing the Oklahoma State Penitentiary at McAlester as a direct or indirect result of its orders. Inmates v. Eisanstadt, 360 F.Supp. 676, 691 (D. Mass.1973) affirmed, 494 F.2d 1196 (C. A. 1, 1974); *Cf.* Hamilton v. Love, 328 F.Supp. 1182, 1194 (E.D.Ark.1971). Notwithstanding the grossly offensive conditions and treatment of inmates found to exist at the Oklahoma State Penitentiary at McAlester, it is also within the authority of this Court to refrain, in its discretion, from entering at this time any order that would require or have the effect of requiring the closing of the penitentiary. The Court concludes that, at this time, the interests of all parties to the case and the public interest would be best served by the Court affording the authorities of the State of Oklahoma and of the Oklahoma State Penitentiary the opportunity to bring conditions and treatment of inmates at the penitentiary into conformity with the requirements of the United States Constitution, federal civil rights laws, and the laws, regulations and policies of the State of Oklahoma.

## JUDGMENT, DECREE, INJUNCTION AND ORDER FOR REMEDIAL ACTION

In accordance with the findings of fact and conclusions of law set forth above, and because of the determination by the Court that it is necessary for an order to issue in this case and to be in effect during the time that may be necessary for the formulation, approval and implementation of plans for complete relief, it is

Ordered that the defendants, their officers, agents, servants, employees and all other persons in active concert or participation with them, and all their successors in office, who receive actual or constructive notice of this Order by personal service or otherwise as hereinafter provided, are hereby enjoined from operating the facilities of the Oklahoma State Penitentiary McAlester, Oklahoma, in any manner inconsistent with the following provision of this Order:

*Order on Racial Segregation and Discrimination*

1. Racial discrimination in any aspect of the operations of the Oklahoma State Penitentiary shall cease forthwith and forever.

2. All future cell or other housing assignments at the penitentiary, whether initial or subsequent, shall be made in accordance with a classification and assignment system in which the race of the inmate is not a factor considered. All requests by inmates for transfers from one cell or other housing assignment to another shall also be processed and decided without regard for the race of the inmate making the transfer request.

In order to insure that the mandates set forth in this paragraph are not allowed to operate so as to perpetuate segregation or facilitate resegregation, the warden shall set as a goal that all major housing units (cell blocks, dormitories, runs, etc.) should generally approximate in their respective racial compositions the racial composition of the inmate population as a whole. This is not to be an inflexible rule, as legitimate considerations within the operating scope of a valid, non-racially biased classification and assignment system may well produce some imbalances in this regard. The warden shall, however, on a quarterly basis, report to the Director of the Department of Corrections, with copies to all counsel of record in this case,* a detailed justification for each major housing unit that deviates more than 10% in either direction in the racial composition of its population from the racial composition of the inmate population as a whole.

---

* For purposes of mailings, counsel of record will include Mary E. Bane, Quinlan J. Shea, Jr. and Paul Crowe.

The warden of the penitentiary shall insure that there is no segregation within major housing units of the penitentiary.

3. All inmates shall have an equal opportunity to be considered fairly for assignment to and advancement within all jobs that are or may become available at the penitentiary. To assist in insuring that this is achieved, no preference shall be given in future job assignments on the basis of any inmate's previous work experience at the penitentiary, where such preference would have a racially discriminatory effect. Validly applicable work experience prior to entering the penitentiary and any relevant formal education or training may of course be considered.

4. Records will hereafter be maintained at the penitentiary which will include the identity of the person(s) making each initial or subsequent job or housing assignment and the basis for such assignment. If the previous practice of assigning inmates only to departments or industries for work is reinstituted, with the specific job assignments being made within the gaining department or industry, the records of the penitentiary shall include this same information regarding each job assignment or reassignment within each department or industry. If there are job promotions available to inmates, the records concerning each promotion actually effected shall include the reason(s) why the promoted inmate was selected and the name(s) of the other inmate(s) considered for that promotion.

5. Affirmative action to overcome the effects of past discrimination in the operation of housing, dining and recreational facilities, job assignments and the disciplinary system shall be formulated and implemented. Conceding that certain of these operations are either not carried on at the present time, or are carried on at a level far below that which was in effect prior to July 27, 1973, it must nonetheless be recognized that the restoration of normal operations at the penitentiary could present the grave likelihood of the past pattern and practice of pervasive racial discrimination being restored as well.

The defendants shall, within 60 days from the date of this Order, formulate and submit to counsel for the plaintiffs and the plaintiff-intervenor for comment, and to the court for consideration and approval, their plan for the total eradication of any present segregation and other forms of racial discrimination, for overcoming the continuing present effects of segregation and other forms of racial discrimination as heretofore practiced at the Oklahoma State Penitentiary, and for precluding the reinstitution of any discriminatory practices which were in effect prior to July 27, 1973.

The plan so submitted shall include, but not be limited to, provisions for the on-going examination of all operating procedures within the penitentiary for possible discriminatory effects; provisions for training present and future staff in the area of human relations, and the timetable for conducting such training; provisions for effective statistical and other checks and reviews at the administration level within the penitentiary; and provisions for additional checks and reviews within the Department of Corrections.

The plan so submitted shall also include the details of a procedure for the review and analysis of records maintained pursuant to paragraph 4 of this order. To overcome the effects of past discrimination in job assignments, the plan will also include a requirement, as to any specific job category wherein the racial composition of the inmate group assigned to that job category deviates more than 10% in either direction from the racial composition of the inmate population as a whole, that a detailed justification for each such deviation be prepared on a quarterly basis. Such justifications shall be submitted over the signature of the warden of the penitentiary to the director of the Department of Corrections and to all counsel of record in this case.

To insure the eradication of discrimination in the operation of the penitentiary disciplinary system, the plan shall also include provision for appropriate training for all individuals who prepare, investigate, review or process inmate disciplinary reports, as well as all individuals who sit on or review the results of the proceedings of disciplinary committees, and all individuals who review, approve or consider appeals from the results of such disciplinary proceedings.

*Order of Procedural Due Process*

6. The Findings of Fact and Conclusions of Law pertaining to this subject make it indisputably clear that the disciplinary system as it existed and exists at the Oklahoma State Penitentiary has failed to meet constitutional requirements in almost every possible regard. Nonetheless, the Court is not unmindful of the disparate views that exist among judges, penologists and experts as to precisely what quantum of process is "due" in all of the different kinds of disciplinary proceedings that necessarily go on in a penitentiary. A similar disparity of views exists with regard to many of the administrative decisions that must be made in the ordinary course of prison administration, but which can have serious effects on the inmates concerned. The Court is firmly of the opinion that the best disciplinary system is one that is universal, in the sense of being carefully constructed to deal appropriately, but nonetheless fairly, with all of the varying kinds and degrees of offenses and rules infractions that can be and are committed in this or any other penitentiary. The same is true with regard to the administrative decision-making process by means of which significant administrative decisions affecting inmates are made.

7. Accordingly, the Court will make no effort at this time to prescribe a complete set of rules and regulations regarding procedural due process, or even to provide detailed guidelines as to what would constitute an appropriate and constitutional disciplinary system for the Oklahoma State Penitentiary, nor will it do so regarding those aspects of the penitentiary's administrative decision-making process that have led to constitutional violations in the past. If it is possible to do so, it is far preferable for those provisions necessary to overcome past constitutional deficiencies to be fashioned as part of an organic whole—that is, of a comprehensive system.

8. In the course of the preparation for and presentation of this case, counsel for the plaintiffs, the plaintiff-intervenor and the defendants have gained a possibly unique perception of the problems herein involved. The Court therefore directs counsel for the parties to confer and attempt in good faith and in a spirit of cooperation to fashion a detailed, comprehensive disciplinary system for the penitentiary system to which all parties can agree in a submission to the Court. The Court further directs counsel so to confer regarding the administrative mechanism(s) by means of which decisions are made that significantly impinge upon the rights, interest, welfare and rehabilitative potential of the inmates of the penitentiary. Even if total agreement concerning these matters is not promptly achieved, the Court directs that counsel persist in their efforts and insure that as much as possible is worked out through the process of negotiation and agreement. The final product of this undertaking will be submitted to the Court for consideration and approval not more than 60 days from the date of this decree, and will be accompanied by (if necessary) submissions on behalf of each party regarding those points concerning which agreement has not been possible and constitutional interests are involved.

9. The purpose of the Court in promulgating the foregoing portion of its decree is to attempt to insure that the disciplinary system and the administrative decision-making machinery at the Oklahoma State Penitentiary are constitutional in all respects, but are at the same time adequate to fulfill the real needs of discipline and administration

within the penitentiary. These goals are not mutually exclusive.

10. In the interim, the following rules shall apply:

a. No inmate shall be disciplined in any manner except for violation of a written rule, promulgated prior to the commission of the offense charged, which, in general terms at least, was adequate to have given the inmate reasonable notice that the conduct subsequently alleged as the basis for the charge could constitute a punishable act; this does not, of course, require that every possible set of facts that could be charged must be set forth with particularity, but it does prohibit punishing an inmate for conduct that he did not reasonably know could be the basis for punishment;

b. No summary punishment shall be inflicted, although this does not preclude a correctional officer from reprimanding or warning an inmate that repetition or continuation of particular conduct could or will result in a disciplinary charge being filed;

c. Inmates charged with infractions must be given official written notice of the charges against them and, in reasonably specific terms, the conduct that formed the basis for the charge, said notice to be given a reasonable time prior to any hearing that must or may be held on such charges;

d. No written charge shall be disposed of nor significant disciplinary sanction imposed on any inmate without a hearing at which the inmate is accorded a reasonable opportunity to be heard and to present his defense to, explanation of, or matters in mitigation regarding the charge(s) against him;

e. The members of the disciplinary hearing shall be impartial; as a minimum, no person who was involved in bringing, investigating or processing any charge shall sit on the panel that determines the guilt of the inmate of that charge or the punishment, if any, to be imposed as a result.

f. Disciplinary charges against inmates shall be disposed of, by hearing or otherwise, as soon as practicable and such disposition shall not be delayed pending possible action in the civil courts concerning the same or related matters.

g. If disciplinary sanctions are imposed that include indefinite terms in lockup, disciplinary segregation, etc., there shall be a review of the need for the continuation of such status on a regular basis, either by the disciplinary panel that imposed the sanction, by an alternate or amended panel the members of which are impartial as defined above, or by a high-ranking, disinterested administrative official at the penitentiary; no correctional officer performing duty in the lockup area where the inmate is confined shall participate in the process of deciding whether continued confinement is warranted, except that he may make such reports as to the inmate's behavior as are routinely required by penitentiary regulations and may make recommendations, with reasons therefor, as to whether continued confinement is so warranted;

h. Inmates on disciplinary lockup shall not be subjected to significant additional restrictions or sanctions except in accordance with a procedure that comports with the requirements of paragraph 10 a–f, *supra*.

i. Inmates who allegedly commit offenses or other rules infractions shall not be placed in pre-hearing detention unless a reasonable basis exists therefor, such as the fact that their continued presence in general population poses an actual threat to the security of the institution; absent unusual and sufficient circumstances, pre-hearing detention in excess of 48 hours (72 hours if a weekend is involved) shall be presumptive evidence of a violation of paragraph 10 f of this Order; and

j. To insure that no inmate is punished in violation of the provisions of this paragraph through a process of

denominating the procedure employed "administrative," rather than "disciplinary" in nature, the provisions of this paragraph shall apply generally to any administrative action to be taken that could result in the inmate being confined under punitive conditions; if an inmate is placed in administrative segregation pending investigation of serious charges against him, the review process required by paragraph 10 g shall insure that the investigation is being conducted with all practicable expedition, or the inmate shall be released from such status.

*Order on Conditions of Confinement*

11. Any future use of that form of disciplinary status which was known officially as "72 hour detention" and which involved confinement in the subterranean isolation area commonly known as "the hole" is prohibited.

12. Effective immediately, before any inmate is confined in an isolation cell in the Maximum Security Unit, compliance with the procedures of paragraph 10, *supra*, is required.

Within 60 days of the date of this decree, the defendants shall submit to counsel for the plaintiff and the plaintiff-intervenor for comment, and to the court for consideration and approval, a proposed set of comprehensive regulations intended to govern future confinement in the isolation cells in the Maximum Security Unit. These proposed regulations shall set forth the conditions and treatment to be provided inmates confined in such cells and a maximum time limit for the duration of such confinement. Prior to submitting these proposed regulations to the Court, the defendants shall have said regulations reviewed by competent medical authorities, not employed by or connected with the Department of Corrections, who shall also inspect the isolation cells themselves. No proposed set of regulations shall be submitted to the Court. that is not accompanied by a statement from said medical authorities to the effect that confinement in these cells, un-

der the conditions included in the proposed regulations and found to exist. at the time the cells are inspected by said medical authorities, under the treatment procedures called for in the proposed regulations, and for the maximum duration provided for in the proposed regulations, does not constitute an unreasonable risk to the physical or psychological well-being of an inmate so confined.

13. Inmates who are confined in any form of administrative segregation shall be accorded as many of the privileges enjoyed by general population inmates, to the extent enjoyed by those inmates, as the nature and purpose of their confinement in administrative segregation will allow. This provision applies, notwithstanding the fact of compliance, where appropriate, with the provisions of paragraph 10, *supra*.

14. All inmates shall be afforded a reasonable time outside their cells, daily, for the purpose of exercise or other form of recreation. This provision shall be effective 10 days from the date of this decree. Weather permitting, general population inmates shall be allowed outdoors during at least part of this exercise period. If at all possible, inmates in administrative segregation and disciplinary segregation shall also be allowed outdoors for this purpose.

15. Within 60 days of the date of this decree, the defendants shall cause to be made a study of the actual diet being furnished to the inmates at the Oklahoma State Penitentiary. This study shall be conducted by an individual(s) qualified in the areas of diet and nutrition. The results of this study shall be submitted in the form of a report to the Court, with copies to counsel for the plaintiff and the plaintiff-intervenor, and shall cover at least the caloric and nutritional adequacy of said diet. The report shall also address itself to the specific question of whether Muslim inmates are receiving the opportunity to be adequately fed (in terms of both calories and nutrition), without having to eat items prepared with pork or pork by-products.

16. Until other programs for the useful and constructive occupation of the general population are instituted or resumed, defendants shall undertake to provide inmates with all practicable means for mental diversion and/or self-improvement while confined to their cells.

This portion of the Court's decree could be satisfied by offering inmates an opportunity to participate in "cell study" programs, similar to those offered to invalid students in other state institutions.

*Order on Use of Chemical Agents*

17. The unjustified use of chemical agents against inmates is prohibited. They shall not be used against individual inmates, or against small groups of them, except as authorized by the policy statement of the Oklahoma State Department of Corrections dated January 4, 1973. To support the use of this form of physical force, the requirement of that policy statement that there be an actual and imminent threat of death or bodily harm must be present. Chemical agents may also be used to quell an actual or incipient riot involving a large number of unconfined inmates, where there is present an actual and imminent threat of death or bodily harm, or an actual and imminent threat of serious damage to or the destruction of property which is substantial in quantity and/or value. They may also be used to thwart the imminent escape of an inmate or inmates.

18. Whenever chemical agents are used against an inmate or inmates, all reasonable precautions shall be taken to avoid or minimize inflicting the effects thereof on innocent inmates.

19. Chemical agents shall not be used to enforce silence or otherwise to enforce the rules and regulations of the penitentiary, unless the conditions set forth in paragraph 17 are present. It will be an exceptional situation in which the use of these agents can be justified against an inmate locked in his cell. Even where a large number of inmates locked in their cells are involved in a disturbance, chemical agents shall not be used if they are merely noisy, or shaking the doors of their cells (so long as the doors remain secure), or because of anything they may say to or shout at any member of the penitentiary staff. These and similar rules infractions on the part of inmates are properly dealt with by means of the penitentiary disciplinary system, with due process safeguards, rather than summarily.

20. As is the case with any use of physical force against inmates, the use of chemical agents must never exceed that reasonably required to effect the legitimate ends of penitentiary officials. Accordingly, the use of chemical agents against inmates, on the rationale that the actual situation is one which could develop into—although it has not yet become—one in which the use of such agents is permitted, constitutes the excessive use of physical force and is prohibited both by the departmental policy statement of January 4, 1973, and by this Order.

21. Every incident involving the use of any chemical agent against any one or more inmates shall be reported in writing by the warden to the director, with copies to all counsel of record in this case, within three days of the incident until further order of the Court. A full and complete statement of all relevant circumstances shall be included in such reports. If, in the opinion of the warden, further investigation is required, he shall denominate the report an interim report and shall submit a final report when the entire investigation is completed, but not less than ten days after the incident. Any justified modification of the factual statement set forth in the interim report shall be included in this final report.

22. Within the parameters delineated by this Order, there remains great scope for the proper exercise of judgment and sound discretion on the part of penitentiary officials. The proper exercise of such judgment and discretion should not be superseded by any Court and will not

be by this one. The contrary proposition is equally necessary, however; the unconstitutional use of chemical agents against inmates can neither be permitted nor condoned. What the Court has condemned in this Order is not the use of chemical agents in situations where the use of physical force against inmates is justified, but where reasonable men might differ on the kind or degree of necessary force. The Court has condemned the use of chemical agents in situations where the use of any physical force is unjustified.

*Order on Medical Care*

23. Within 60 days from the date of this Order, the defendants shall formulate a comprehensive plan for providing constitutionally adequate routine and emergency medical care (including psychiatric care) to all inmates at the Oklahoma State Penitentiary. This plan shall be submitted to counsel for the plaintiffs and for the plaintiff-intervenor for comment, and to the Court for consideration and approval.

24. This plan shall include, but need not be limited to, the provisions necessary for the operation of an in-patient medical facility within the secured area of the penitentiary (or in such close proximity thereto that security considerations will not unreasonably delay the receipt of needed medical care by inmates in the security area). This in-patient facility shall comply in its operating procedures, staffing, equipment and physical plant with the regulations of the Oklahoma State Department of Health governing the licensure of hospitals and related institutions, or with some other set of comprehensive standards generally accepted within the medical profession.

The staffing provisions of the plan shall provide as a minimum:

a. nursing care 24 hours a day, seven days a week;

b. a full-time Chief Medical Officer;

c. the equivalent of one additional full-time doctor;

d. an adequate support staff of qualified generalist or specialist medical para-professionals;

e. such additional dental and dental support staff as will bring dental care in the penitentiary system to an acceptable level; and

f. a designated staff member to be responsible for insuring that adequate in-patient psychiatric care and treatment are provided.

The plan shall also specify the extent to which medical facilities and personnel outside the penitentiary system are being relied upon to provide medical care for inmates and the specific means by which such outside care will be secured. Also included will be appropriate provisions pertaining to the control, storage, handling and distribution of all medications.

25. Pending the formulation, approval and implementation of such plan, the defendants shall insure that each inmate who goes on sick call is seen by a medical doctor or by a fully-qualified health para-professional (*e. g.*, physician's assistant, medical technician, etc.). No individual member of the staff or inmate population who is not a fully-qualified health professional or para-professional shall inhibit, prevent or obstruct any inmate from going on sick call.

*Order on Correspondence and Publications*

26. The confidentiality of any inmate's outgoing correspondence to any attorney, court, or government official or agency shall not be abridged. This provision is specifically applicable to mail to be sent to any court which is required by that court to be notarized. Incoming correspondence from any of these sources may be opened and inspected for contraband, but only in the presence of the inmate-addressee, and may not be delayed or read.

27. With respect to all other correspondence to and from inmates of the

penitentiary system, the Court has previously noted with approval the recent, significant improvement in defendants' policies. Within 60 days from the date of this decree, defendants shall submit whatever modifications of their existing policies, specific practices or operating procedures in this area are deemed by them to be required or warranted in the light of the provisions of Conclusions of Law 29–31, inclusive, *supra*, or the recent decision of the United States Supreme Court in the case of Procunier v. Martinez, —— U.S. ——, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Such shall be submitted, together with a written presentation of their unmodified policies, practices and operating procedures in the form of a single, proposed comprehensive regulation for consideration and approval by the Court. Copies of this submission shall also be sent to counsel for the plaintiffs and the plaintiff-intervenor for comment. No inmate, whether enjoying unrestricted or restricted correspondence status under defendants' existing policy statement, shall be subjected to any arbitrary limitations on the number of approved correspondents, the identity thereof, etc.

28. With respect to general circulation publications, such as newspapers and magazines, a comprehensive regulation, consistent with all aspects of Conclusion of Law 32, *supra*, shall be submitted within 60 days from the date of this decree, to counsel for the plaintiffs and the plaintiff-intervenor for comment, and to the Court for consideration and approval. This plan shall include all of the necessary and reasonable rules with which an inmate must comply in order to subscribe to any such general circulation publication. It shall also include those detailed internal operating procedures necessary to insure that any present, continuing effects of past arbitrary and capricious practices in this area are overcome.

29. No decision shall be made to exclude any publication except as may be required by the needs of security, good order, or rehabilitation; nor shall any such decision be made by any penitentiary official other than the Warden or Deputy Warden, and then only after full compliance with the applicable provisions of Conclusion of Law 32, *supra*, regarding notice, opportunity to submit additional facts, etc. Any decision to exclude shall be made solely on the basis of the content of the specific publication in question and the official actually making the decision shall prepare and retain on file a detailed statement of the specific basis for each such exclusion.

*Order on Access to the Courts*

30. Within 60 days from the date of this Order, the defendants shall prepare and submit to counsel for the plaintiff and plaintiff-intervenor for comment, and to the Court for consideration and approval, a comprehensive plan for insuring that inmates at the Oklahoma State Penitentiary have adequate and effective access to the Courts. The plan shall consider and address the problem of reasonable access in terms of habeas corpus petitions, § 1983 and other civil rights matters, out-of-time appeals, and such other matters as are addressed more particularly in the Findings of Fact and Conclusions of Law, *supra*. In order to insure that effective access is available throughout the penitentiary system, appropriate consideration shall be given to the number of inmates in the penitentiary system, the fact of their geographic dispersion, the anticipated number of requests for post-conviction legal assistance, and the educational level of the overall inmate population.

31. Pending the information, approval and implementation of such a plan, the defendants shall forthwith refrain from interfering with the acquisition or possession by inmates of legal materials, including transcripts, lawbooks, legal periodicals, paper, etc. They shall also arrange for capable and experienced inmates to be allowed to help those who require assistance in order to be able effectively to frame and present legal is-

sues and relevant facts for judicial consideration.

32. The defendants shall forthwith advise all inmates that they are permitted to subscribe to any legal periodical and to seek to obtain lawbooks and legal assistance by mail. The defendants shall insure that the inmates understand that they are permitted to purchase and possess legal periodicals and books specifically dealing with the legal problems of inmates and that they are authorized to write to organizations concentrating on such problems in an effort to obtain legal assistance, reference materials, etc.

### Order on Religious Freedom

33. Defendants shall forthwith cease all unreasonable interference with the provision to inmates of spiritual counselling and the opportunity to engage in group religious services.

34. Defendant shall forthwith advise all inmates of the penitentiary system that they may subscribe to and receive religious publications, including books, newspapers and magazines, unless any such publication demonstrably presents a threat to security, discipline and good order within the institution that cannot otherwise be overcome.

Muslim inmates shall forthwith be advised specifically that the above authority to subscribe to and receive religious publications extends to the publications entitled "Message to the Black Man" and "Muhammad Speaks." They shall also be advised of every food item served to the inmates of the penitentiary that is known or believed by the defendants to contain pork or pork by-products.

35. Within 60 days of the date of this decree, the defendants shall advise the Court, in writing, with copies to counsel for plaintiff and plaintiff-intervenor, of the progress to date and of all future plans for providing religious counselling and group services, and of the fact of compliance with the remaining provisions of this portion of the Court's decree.

### Order on Security and Staffing

36. The Court has found that there were and are serious deficiencies in the level of overall security within the Oklahoma State Penitentiary. In different ways, this involves the security of the institution itself, the personal security of the members of the staff and the inmates who, as wards of the state, are entitled to and indeed must look to the state to reasonably insure their safety. The Court has further found that these security deficiencies are in large measure due to both a serious shortage of staff at the penitentiary and to a very high turnover among staff members. Many of the unconstitutional conditions and practices that exist at the pentitentiary (or which existed in the recent past and have present continuing effects) cannot be corrected without a considerable improvement in these areas of security and staffing.

37. Accordingly, counsel for the defendants shall, within 60 days of the date of this Order, submit to counsel for the plaintiffs and the plaintiff-intervenor for comment, and to the Court for consideration and approval, a plan for effecting promptly all necessary improvement in the areas of security and staffing.

38. In the interim, the defendants are advised that alleged shortages of staff shall not be deemed to constitute an acceptable reason for the failure to comply fully with any provision of this decree. Unless specifically provided to the contrary herein, alleged security considerations shall also be deemed not to constitute an acceptable reason for the failure to comply fully with any provision of this decree.

### Order on General Provisions

39. Certain difficulties that arose in the course of the trial of this case would have been more readily resolved if permanent records had previously been maintained of inmate housing assignments, by cell-block and cell, beginning with each inmate's initial assignment

and showing the inclusive dates of it and all subsequent assignments. Furthermore, compliance with certain provisions of this decree will be more readily determined if such records are maintained. Accordingly, the defendants are directed to annotate the permanent records kept on each inmate with his present housing assignment and to insure that subsequent assignments are also recorded therein.

40. Counsel for plaintiffs and plaintiff-intervenor will have access at all reasonable times to such records as are maintained concerning penitentiary inmates, whether or not required to be kept by this decree. They shall also have unimpeded access to individual inmates at all reasonable times for purposes of conducting interviews to ascertain whether there has been compliance with all provisions of this decree. Counsel for plaintiff-intervenor are specifically authorized to utilize Special Agents of the Federal Bureau of Investigation for these purposes.

41. If any of the defendants shall have any doubt or question as to the meaning, scope or application of any provision of this decree, the inquiry shall be submitted to the Court in writing in a communication from counsel for the defendant(s). The responsive communication from the Court will also be in writing. Copies of all such communications shall be placed in the file of this case and concurrently served upon counsel for the plaintiffs and plaintiff-intervenor. The same procedure shall apply to any such inquiries that may be deemed necessary by counsel for the plaintiffs or the plaintiff-intervenor.

The defendants are charged with the duty of fully explaining the terms of this decree to all of their agents, servants, representatives and employees, including penitentiary staff, guards and other personnel, and to assure their understanding of the court's requirements and the necessity for strict compliance therewith.

42. The Court retains jurisdiction of this case for all purposes and specifical-

ly reserves the power to issue further and supplemental orders in aid of the provisions of this injunction or any of its terms. The Court also reserves for determination all issues not dealt with expressly herein.

43. In lieu of service by the United States Marshal, the Clerk of this Court is hereby directed to send by United States mail a certified copy of this Order to each of the defendants in this case and to any other individuals identified in the Preliminary Statement as having succeeded in office any of the named defendants.