MASJID MUHAMMAD–D.C.C., Wilbur Shabazz, s/n Lionel Clayton a/k/a Muhammad Ali, Rauf Muhammad, s/n Louis Gardner, a/k/a Mumin Rhim, Amir Fatir, s/n Robert Saunders, a/k/a Shamsiddin Ali, and Amin Hassan, Plaintiffs,

v.

Paul KEVE, Raymond Anderson, James Vaughn, Walter Redman, George Pippin and Phyllis Patterson, Defendants.

Civ. A. No. 77–221.

United States District Court,
D. Delaware.

Oct. 22, 1979.

tiffs' claims which are based upon federal constitutional grounds.

Plaintiffs, pro se.

John A. Parkins, Jr., Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge:

The plaintiffs in this civil rights action are Masjid Muhammad-D.C.C., the Mosque of the World Community of Al-Islam in the West at the Delaware Correctional Center ("D.C.C.") in Smyrna, Delaware, and five of its members, Wilbur Shabazz, Rauf Muhammad, Amin Hassan, Muhammad Ali and Mumin Rahim. The defendants are James Vaughn, the Commission of Delaware Corrections, Raymond Anderson and Walter Redman, the former and present Superintendents at D.C.C., George Pippin, the Assistant Superintendent at D.C.C., and Phyllis Patterson, the Food Service Director there. This Opinion constitutes the Court's findings of fact and conclusions of law.

## I. THE HISTORY OF THE LITIGATION.

In their complaint, the individual plaintiffs allege that they are Muslims, that the Muslim religion forbids the consumption of pork, and that the menu at D.C.C. includes pork. They go on to assert: (1) that they do not receive a healthy and nutritional pork-free diet at D.C.C., and (2) that there is no reliable way of ascertaining which foods served at D.C.C. contain pork. These alleged failures of the defendants to provide plaintiffs with a satisfactory pork-free diet and reliable information regarding pork content is said to violate the plaintiffs' rights under the First and Fourteenth Amendments. Both injunctive relief and damages are sought.

Shortly after the initiation of suit, the plaintiffs moved for a preliminary injunction and amended their complaint. The amended complaint adds allegations that several of the plaintiffs have been disciplined for failing to respond when addressed by guards by the names under which they had been committed to the institution rather than the Muslim names they had assumed following their commitment. Plaintiffs assert that the failure of D.C.C. to recognize their Muslim names also violates their rights under the First and Fourteenth Amendments.

Based upon the evidence presented at the preliminary injunction hearing, I granted some of the interim relief which the plaintiffs had requested.[1] I was not persuaded at that time that the menu offered at D.C.C. would "deprive an abstaining Muslim of a sufficient diet."[2] However, I was persuaded that there was a "lack of reliable information"[3] concerning the presence of pork on the menu. I stated:[4]

> On this record, I conclude that plaintiffs have demonstrated a probability that they will ultimately be entitled to injunctive relief designed to provide them with the information in the possession of the prison staff regarding pork content. Since I accept the sincerity of plaintiffs' religious belief and find inadequate assurance in the record that accurate and

1. Docket Items 13, 14.

2. Docket Item 13, p. 7.

3. *Id.*, p. 8.

4. *Id.*, pp. 8–9.

complete information will be made available under the current system, I also conclude that irreparable injury may occur if interim relief is denied.

Based on these conclusions and upon plaintiffs' right to discovery, I issued an order aimed at providing the plaintiffs with reliable information regarding the pork content of the food served. That preliminary injunction stated: [5]

1. Defendants, on or before August 25, 1977, will assign a member of the plaintiffs' Mosque to kitchen duty and he shall remain so assigned until further Order of this Court.

2. The designated inmate will be assigned regular kitchen responsibilities but will be permitted a reasonable opportunity to observe cooking and to inspect the labels on the food to be served. Defendants shall make the necessary arrangements so that the designated inmate may prepare and dispatch a notice to each food service location which shall state the presence or absence of pork and specifically the items, if any, containing pork. Defendants shall retain a copy of such notice and shall provide a copy to the plaintiffs.

This Order has remained in effect throughout this litigation.[6]

In addition to the preliminary injunction testimony, which was made a part of the record on the merits, ten days of testimony were heard at trial.

## II. THE PORK ISSUE.

### A. *The Facts.*

At the time of trial there were approximately seventy-five Muslims at D.C.C. among a total population of about 650 inmates. The individual plaintiffs are members of a "religious community known as Masjid Muhammad-D.C.C. of the World Community of Al-Islam in the West." [7] It is agreed that Al-Islam is a *bona fide* religion and that Masjid Muhammad-D.C.C. is a *bona fide* religious community. Finally, it is agreed that plaintiffs' religion prohibits them from knowingly eating or handling either pork or essence of pork.[8]

D.C.C. opened in 1971. From at least 1962 until 1971, Muslims incarcerated at the New Castle County Workhouse, the predecessor of D.C.C., were given "low grease" medical diets which were pork-free by order of the institution's physician, Dr. Vandervort. When pork was served during that period, Muslims received a substitute, usually beef or eggs. Shortly after D.C.C. was opened, however, pork-free diets for Muslims were discontinued. The current physician at D.C.C., Dr. Srivastava, understandably takes the position that Muslim dietary restrictions are not a medical problem and refuses to prescribe special diets solely on religious grounds.

In February of 1973, Rules for the Treatment of Inmates at Delaware Correctional Institutions (PX–11) were promulgated. Rule 15 of those Rules provides:

(1) Every inmate shall be provided by the administration at usual hours with food of nutritional value adequate for health and strength, of wholesome quality and well prepared and served.

\* \* \* \* \* \*

(3) No inmate shall be required to eat food prohibited by his religious belief.

This rule continues in effect.

In September of 1975, plaintiff Shabazz wrote to the Chaplain at D.C.C. explaining the prohibition against the consumption of pork by Muslims. He noted that the posted menus listed pork on a frequent basis and added that even those meals which were not supposed to include pork often did. The issues thus raised were referred to Superintendent Anderson. He discussed them with Ms. Patterson, the Food Service Director,

---

**5.** Docket Item 14.

**6.** I declined to issue a preliminary injunction with respect to the use of plaintiffs' Muslim names on the ground that plaintiffs had failed to show a probability of success on that issue.

**7.** *See* Docket Item 56.

**8.** *Ibid.*

and they agreed to change the menus so as to reduce the number of meals at which pork would be served.

About a year later, in the Fall of 1976, Shabazz wrote to Ms. Patterson concerning the pork issue. (PX–2). The dietary problem of the Muslims at D.C.C. had not been solved:

This has been, as I've said, an ongoing concern. We are asking you if you would give this matter some consideration. Many prisons have resolved this problem in any one of many ways. On the surface, it may seem that the solution would entail difficulties or problems. We believe it won't.

Perhaps possible easy and quick solutions are to simply provide an alternative or substitute for the many pork meals, to avoid over-use of meals containing pork products, and/or to provide navy beans soup (relatively inexpensive and easy) at every meal when pork is the main item of food. All the members of Muhammad's Mosque here as well as many others have indicated that this last consideration (bean soup) would be amenable to them and would afford the administration a simple solution to an on-going and mutually irritating matter.

On October 4, 1976, defendant Pippin issued an order which stated:

This memo is to remind all personnel concerned that no food substitute for meals will be granted for any inmate.

The food that is scheduled per menu must be eaten by the inmate. If there is something that he does not desire on the menu, he does not have to eat it. No inmate is to demand a substitute because of religious or personal endeavors.

This order is to be strictly adhered to with no changes unless approved by myself or Supt. Redman. (PX–1).

Pippin testified that he issued the order because requests for substitutions were creating dissension at the institution, and because of the large volume of such requests.

On October 7, 1976, Ms. Patterson wrote to the plaintiff Shabazz in response to his letter. (PX–3). She stated in part:

As of December 27, 1976, all pork products will be removed from the menu except state pork. That is the pork we receive from the hogs raised at Sussex Correctional Institution and butchered once a month; this pork will still be used as menu items. No other pork products will be purchased for menu use.[9]

Ms. Patterson's letter reiterated that there would be no special religious diets as such and this remains the policy of the institution today. Since late 1976, however, Ms. Patterson has followed the practice of putting an extra vegetable or soup on the menu whenever pork is served.

Prior to October of 1976, when Mr. Shabazz raised the pork issue for the second time, the Muslims' problems with their diet were considerably more severe than they presently are. The defendants have submitted copies of the inmate master menus used at D.C.C. from July, 1975 to December, 1977. (DX–2). In 1975, the menu cycle was six weeks, or forty-two days, long. Of the forty-two days, pork was listed to be served at seventeen breakfasts, six lunches, and eight dinners. Of the forty-two days on the cycle, pork was on the menu at two meals in the same day on four different occasions. In 1976, the forty-two day menu cycle included pork on twelve breakfasts, on four lunches, and on five dinners. On three of the forty-two days, pork was listed on the menu for two meals. In 1977, the forty-two day cycle included pork on fourteen breakfasts, on no lunches, and on three dinners. The menu does not list pork as being served twice a day on any of the forty-two days. Thus, the number of meals at which pork was served decreased steadily from 1975 to 1977.

---

9. In that letter, Ms. Patterson did state that "[i]t would be impossible to keep the essence of pork out of all foods as a small amount of pork bone marrow is utilized in products to act as a preservative against spoilage of canned, powdered and dried food." At trial, Ms. Patterson testified that she was mistaken in this belief. Dr. Mir Nazrul Islam, the defendants' expert on food science and nutrition, testified that pork bone marrow is not used as a preservative of foods. There is no credible evidence in the record to the contrary.

The frequency of the service of pork is not the only problem which Muslim inmates have encountered, however. They claim that they are unable to practice their religious faith at D.C.C. because it is impossible for them to determine which food items contain pork. This problem was more acute previously than today but still exists.

Prior to December of 1976, when Ms. Patterson stopped buying pork products, there were many occasions when the plaintiffs were either not informed or misinformed as to the presence of pork in food served. For many years inmates were not told, for example, that pork was being used by the cooks in seasoning vegetables.[10] In addition, luncheon meats were served which sometimes contained pork and sometimes did not. When the Muslim inmates sought further information about the content of the luncheon meats they were at times unable to secure a response from the kitchen and at times received information which was later found to be inaccurate. Other experiences during this period with items such as margarine and jello, which were produced from pork products, made the Muslim inmates distrustful of the information they received from the food service staff.

Since December of 1976, the situation has improved, but a number of episodes have served to perpetuate the inmates' distrust of staff-provided information regarding pork content. Despite the fact that D.C.C. has ordered only non-pork products since that date, vendors have nevertheless delivered luncheon meats and margarine which contained pork. When the disparity between the order and the delivery has been discovered, the items have been returned and exchanged for non-pork products. On other occasions, however, the pork products have been served without notice of their pork content.[11]

Since this Court issued its preliminary injunction, the plaintiffs have had a Muslim observer in the kitchen who has monitored the pork content of foods served and has reported to the other Muslim inmates. If the observer finds the meal in question to be pork-free, he dates and signs a "Food Preparation" form and it is distributed with the food. If he finds that the meal contains pork or some pork derivative, he explains which items contain pork at the bottom of the memo. DX–10 and 11 contain well over one hundred completed "Food Preparation" forms from March and April of 1978. On all but seven of those forms, the Muslim observer indicated that the meal was pork-free. On the other seven, there was a notation that some type of pork product was served and a message that everything was pork-free except for that item. One of the Muslim observers testified that of the one hundred fifty meals which he monitored, he had to communicate the presence of pork to other Muslim inmates on only twelve occasions. The observers also testified that they were permitted access to all aspects of the meal preparation process, beginning with an inspection of the labels of the original packaging. Ms. Patterson testified at the preliminary injunction hearing that the use of a Muslim observer in the kitchen at D.C.C. would present no problems from her point of view.

When pork arrives at D.C.C. from the Sussex Correctional Institution it is placed in a supply storehouse. It is stored in the same freezer as other types of food, but on separate shelves, and in butcher paper. The kitchen facilities at D.C.C. are such that it is impossible to cook pork and non-pork items in totally separate facilities. There are only four grills in the D.C.C. kitchen. Included in the items cooked on those grills are pork chops and scrapple. It is the practice to clean these grills after pork is cooked upon them and before any

---

**10.** This practice was terminated by Ms. Patterson in early 1975.

**11.** There is record evidence of such occasions in September of 1977 and January and July of 1978. E. g., PX–23, 24, 27 (containing many labels from food delivered in 1977 and 1978 which report pork content). The plaintiffs claim that there have been numerous other occasions when pork items have been delivered and served.

other products are cooked there. They are hosed down, scraped with a sandstone, oiled, rubbed, rinsed, wiped and oiled again. Pork and non-pork products, on occasion, are cooked on grills which are side-by-side at the same time.

Sausage, ham and bacon are all cooked in the same oven as non-pork items. Those ovens are cleaned once a week. While there was testimony that accumulated pork grease in the oven could drip on non-pork items, there is no persuasive evidence that this has been a problem.

The same utensils are used to serve pork and other foods at D.C.C. Those utensils are cleaned after each use with sponges and brushes in water at temperatures of approximately 180°. The food service trays upon which the food is served are cleaned after each use in a dishwasher with a water temperature of approximately 210°.

The plaintiffs introduced the testimony of Imam Shamsiddin Ali, the Imam of the World Community of Al-Islam in the West for the Delaware Valley. The Imam testified that the plaintiffs could conscientiously practice their religion in the context of the D.C.C. food service system if pork continued to be served at D.C.C. with the same frequency as occurred at the time of trial, and if inmates were given notice of the presence of pork in food served. He also testified that, while many Muslims would consider the use of separate utensils for non-pork foods to be the ideal practice, the use of a single set of utensils was acceptable in an institutional setting if those utensils were adequately cleaned.

### B. *Analysis.*

■ The right to hold religious beliefs, guaranteed by the "Free Exercise" Clause of the First Amendment, is absolute. *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The right to express those religious beliefs is also guaranteed by the Free Exercise Clause but is not absolute. The State may regulate the time, place and manner of religious expression so long as the regulation is reasonable and content-neutral. *Id.* Such expression may be otherwise restricted by the State, however, only when it can show that the restrictive regulation or practice serves a compelling state interest *and* is the least restrictive means by which that interest can effectively be served. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

The initial inquiry in a case of this kind is whether the conduct or practice which is alleged to have been inhibited or burdened by the State in fact involves religious expression. This inquiry gives rise to two distinct issues: (1) is the conviction behind the expression sincerely held and (2) does that conviction have a theological, as contrasted with a purely social or political, basis. *Id.*; *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

■ I do not understand the defendants to challenge the sincerity of plaintiffs' commitment to the Islamic faith. Nor is there any dispute that a non-pork diet is a practice which has a religious basis for Muslims. It is thus clear that the plaintiffs' practice of consuming only foods with no pork content is entitled to First Amendment protection. The remaining questions are whether the defendants have interfered with this aspect of plaintiffs' practice of their faith and, if so, whether such interference is necessitated by some compelling state interest which cannot be served by a less restrictive means.

As I understand plaintiffs' case, they maintain that the State, having deprived them of the freedom to make their own provisions for the practice of their religious faith, must provide plaintiffs with (1) a nutritionally adequate, pork-free diet, (2) a method of food preparation by which non-pork foods cannot be contaminated with pork, and (3) notice of which foods served contain pork.

■ The parties agree that Muslim inmates are entitled to a diet which provides them with adequate nourishment without the consumption of pork. *See United States v. Kahane*, 396 F.Supp. 687 (E.D.N.Y.1975), *aff'd sub nom. Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975); *Ross v. Blackledge*, 477 F.2d 616 (4th Cir. 1973); *Barnett*

*v. Rodgers*, 133 U.S.App.D.C. 296, 410 F.2d 995 (D.C.Cir. 1969). They disagree, however, on whether the elimination of food containing pork from the meals served at D.C.C. leaves Muslim inmates with a sufficiently nutritious diet. I conclude that the non-pork portion of the food served at D.C.C. provides a healthy, nutritious diet.

As I have noted, the amount of pork served at the institution has materially declined since the Fall of 1976, and since that time an extra vegetable or soup has been added to the menu for meals at which pork is served. The record indicates that, even in 1975, non-pork items provided an adequate diet. Ms. Patterson and Dr. Srivastava, the prison physician, both of whom are qualified experts in the area of nutrition, so testified and there was no expert testimony to the contrary. I accept this testimony and conclude that, at least since 1975, a Muslim inmate at D.C.C. has been able to practice his religion conscientiously and still receive a sufficiently nutritious diet.

In such circumstances, a correctional institution is not obligated to provide a special pork-free diet to Muslim inmates. As the court observed in *X. (Bryant) v. Carlson*, 363 F.Supp. 928, 931 (E.D.Ill.1973):

> [Plaintiffs] are not required to eat pork. They are free to choose the foods and to refrain from eating pork. The prison is not required to provide a special diet to satisfy [plaintiffs'] religious beliefs where, as is apparent here, sufficient nourishment can be obtained from the other food available.

*See also Elam v. Henderson*, 472 F.2d 582 (5th Cir.), *cert. denied*, 414 U.S. 868, 94 S.Ct. 177, 38 L.Ed.2d 117 (1973); *Wilson v. Prasse*, 463 F.2d 109 (3d Cir. 1972); *Knuckles v. Prasse*, 302 F.Supp. 1036 (E.D.Pa. 1969), *aff'd*, 435 F.2d 1255 (3d Cir. 1970), *cert. denied*, 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717, *rehearing denied*, 404 U.S. 877, 92 S.Ct. 33, 30 L.Ed.2d 125 (1971); *Northern*

*v. Nelson*, 315 F.Supp. 687 (N.D.Cal.1970), *aff'd* 448 F.2d 1266 (9th Cir. 1971); *Abernathy v. Cunningham*, 393 F.2d 775 (4th Cir. 1968).

Turning to plaintiffs' second claim, I find no factual predicate for the charge that non-pork food becomes commingled by pork and pork essence during preparation of meals at D.C.C. The record shows that pork and non-pork foods are not cooked together on the grills or in the ovens and that grills, ovens and utensils are cleaned on a regular basis. While there was some speculation from plaintiffs' witnesses about the possibility of grease splattering from a grill on which pork was being cooked to another grill, or dripping of pork essence in the oven, there is no persuasive evidence that commingling occurs.[12]

Plaintiffs' third claim is of more substance. The record indicates that it is not possible for inmates in plaintiffs' position to ascertain whether such frequently served items as bologna, knockwurst, plain loaf, veal loaf, margarine and jello contain pork. Before the preliminary injunction was issued in this case, items such as these which in fact contained pork were served on numerous occasions without notice to the Muslims. On a few occasions plaintiffs were affirmatively told that such items contained no pork and later learned that the information was incorrect. Even the 1976 change to a policy of contracting to buy only non-pork foods has not solved the problem, since vendors continue to deliver items containing pork.

There is no doubt that plaintiffs had difficulty in avoiding pork prior to the issuance of the preliminary injunction. Since defendants have refused to undertake to retain the system provided for in that order or any equivalent system, it is reasonable to expect that, absent Court intervention, such difficulties will continue in the future. The

---

12. Plaintiffs are concerned about commingling. They do not maintain that separate grills, ovens and utensils are necessary to the practice of their religion. They disavowed any claim to a "Kosher" food preparation system and Imam Shamsiddin Ali testified that it is not necessary that there be separate kitchen equipment for pork and non-pork foods to permit plaintiffs to practice their religion faithfully as long as there is a cleaning regimen of the kind which exists at D.C.C.

only remaining question is whether the continuation of these problems will violate plaintiffs' First Amendment rights. I conclude that it will.

■ Muslims are enjoined to refrain from eating pork. While plaintiffs acknowledge that it is not a sin under the tenets of their faith to consume pork *unknowingly*, practicing Muslims are expected to use reasonable diligence to avoid all consumption and consider it important to do so. Although many pork items are identifiable by visual inspection, as the record in this case shows, the restrictions on plaintiffs' access to the normal sources of information on food content materially affect their ability to avoid pork consumption and, to this degree, their ability to practice their religion. While the conditions of plaintiffs' confinement which deprive them of such access are justified by considerations of prison security and order, it is equally clear that alternative means of access could be provided without jeopardy to security and order and, indeed, without significant expense or administrative burden. Since prison officials must adopt practices impinging as little as possible on the free exercise of religion consistent with prison security and discipline, *O'Malley v. Brierley*, 477 F.2d 785, 796 (3d Cir. 1973), it follows that the plaintiffs have a right to be provided with the food content information available to the food service personnel at D.C.C. This is not to say, of course, that prison officials have a duty to make sure Muslim inmates do not inadvertently consume pork. Their duty arises from the restriction on access to the information normally available in the preparation of food, and its scope is limited to providing such food content information as is available to those preparing the food at D.C.C. For this reason, the court in *Battle v. Anderson*, 376 F.Supp. 402 (E.D. Okl.1974), fashioned an order directing that Muslim inmates "be advised of every food item served to inmates of the penitentiary that is known or believed by the defendants to contain pork or pork by-products."

Like the court in the *Battle* case, I conclude that the plaintiffs are entitled to an injunction directing that defendants institute a system reasonably designed to provide plaintiffs with the information on pork content available to the food service personnel at D.C.C. The "inmate observer" system has served this purpose, but I am not prepared to say that plaintiffs have a right to that particular system or that there are not other systems which will serve as well. Defendants will be directed to submit a proposal for Court approval within fifteen days.

■ With regard to the plaintiffs' request for an award of damages, it is clear that the only defendant who was directly involved in the ordering of foods, the planning of menus and the service of food at D.C.C., and thus the only defendant who is potentially liable for damages to the plaintiffs, is Ms. Patterson. *Cf. Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077 (3d Cir. 1976). I conclude, however, that an award of damages against Ms. Patterson is barred by official immunity.

■ The test for determining whether a public official is immune from personal damage liability has two criteria, a subjective one relating to the official's state of mind, and an objective one relating to the reasonableness of his or her conduct. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). To be entitled to immunity the official must establish both (1) that he or she acted in good faith without any intention of violating the plaintiffs' constitutional or other legally recognized rights and (2) that a reasonable person would not have realized that his or her actions would violate a well established constitutional right. *Procunier v. Navarette, supra*. Ms. Patterson has satisfied both of these criteria.

I believe that Ms. Patterson's actions demonstrate that she was responsive to the Muslim inmates' grievances and tried to accommodate the food service system to

their needs. She was in large part successful in her efforts and the only area in which she has been found wanting involves her failure to provide Muslim inmates with all of the information to which this Court has found they were entitled. This deficiency does not suggest bad faith on her part or a decision by her to ignore what she knew to be an inmate's right. To the contrary, I am satisfied that, while Ms. Patterson understood that inmates were to be permitted not to eat pork and non-pork eating inmates must have a nutritionally adequate diet, she did not subjectively appreciate that inmates had a right to more information on pork content than they were receiving.

Having concluded that Ms. Patterson acted in good faith, I turn to the objective aspects of the official immunity doctrine. The *Navarette* case teaches that we must ask three questions in determining whether the objective prong of that doctrine is satisfied: (1) Was the right violated "a clearly established constitutional right" at the time of the challenged conduct? (2) Would a reasonable person in the defendant's position have known enough about the law to be aware of that right? and (3) Would a reasonable person in the defendant's position have known enough about the facts to have realized that his conduct would violate that right? *Navarette* makes clear, however, that no official is required "to predict the future course of constitutional law" and that a public official who has acted in good faith can be held liable only if he or she is found to have violated a "clearly established" constitutional right. Accordingly, the last two questions need not be addressed unless the right violated was a well established one at the time of the defendant's conduct.

I conclude that the right of plaintiffs which Ms. Patterson violated was not a "clearly established" right as that phrase has been used by the Supreme Court. To be sure, three Courts of Appeals, prior to the time period involved in this suit, had held that prison officials must recognize a Muslim inmate's right to refrain from eating pork and must provide him with sufficient amounts of non-pork food to consti-

tute a nutritious diet. I accept for present purposes that the right held to have been violated in those cases was well established during the relevant time period. But those cases did not recognize a right of inmates to receive the information available to their jailers regarding pork content. While that right follows logically from the same source, the same can be said for most new steps in the course of the development of constitutional law. Given the rationale behind the "clearly established right" requirement, I do not believe that phrase was intended to encompass all rights which are derivative or which logically follow from rights which have been generally recognized by the courts.

The right which this Court today recognizes has previously been expressly recognized only by the United States District Court for the Eastern District of Oklahoma in the *Battle* decision, *supra*, 376 F.Supp. 402. That single decision is insufficient to put that right in the category of a "clearly established" constitutional right.

### III. THE NAME ISSUE.

#### A. *The Facts.*

It is common practice for those who become members of the World Community of Al-Islam in the West, upon their conversion, to adopt a new surname which reflects an "attribute to God" and which signifies their new commitment. While one may be a Muslim without changing one's name, this practice has a Quranic base and Wallace D. Muhammad, the Chief Minister of the Nation of Islam, has urged adherents of the faith to follow it.

Each of the plaintiffs was converted to his present faith after his commitment to D.C.C. and has adopted a Muslim name which differs from the name under which he was committed. One of the plaintiffs, Rauf Muhammad, has been through a judicial proceeding which resulted in the issuance of an order formally changing his name. These name changes have come as a result of the plaintiffs' sincere adherence to the Islamic religion and, accordingly, plain-

tiffs' new names have religious significance to them.

Imam Shamsiddin Ali testified that Muslims should call themselves by their Muslim names. On cross-examination, he acknowledged that it would not violate his religious beliefs to respond to an individual who addressed him by a non-Muslim name, particularly if the individual did so in ignorance of the significance of Muslim names. He indicated, however, that an individual Muslim must make a decision about such matters for himself "according to his understanding of his religion." The plaintiffs find their previous names religiously offensive because they consider them a badge of a spiritually unenlightened state which they have transcended.

It is the policy of the D.C.C. to refer to an inmate only by the name under which he was committed to the custody of the Department of Corrections. This "committed name" policy has existed for many years but has not been consistently enforced. It was adopted in the interest of administrative efficiency.

After their conversion, plaintiffs asked members of the institution staff to use their new Muslim names and submitted a list of their Muslim names to the mailroom. A number of the staff and the mailroom personnel initially honored plaintiffs' request. When this came to the attention of the administration, however, orders issued directing that the committed name policy be enforced with respect to Muslim inmates. In particular, Superintendent Redman, on March 30, 1977, issued an order to the mailroom that incoming mail addressed to an inmate in his Muslim name "without the proper name the inmate came into the institution with", would not be processed. "All inmates using their Muslim names" were advised to "use their real name on all incoming and outgoing mail." (PX–29). Since this directive, mail addressed to the plaintiffs in their Muslim names has not been delivered to them.

The committed name policy of the institution has caused numerous additional problems for Muslim inmates. There have been a few occasions, for example, when people seeking to visit Muslim inmates and asking for them by their Muslim names have not been permitted to visit. On one occasion, plaintiff Ali could not obtain a pair of shoes until he would initial for them with the initials of his committed name. Finally, plaintiffs and other Muslin inmates have been disciplined for failing to respond to their committed names.

The committed name policy has caused friction even in those instances when the institution has tried to accommodate itself to Muslim religious practices. During the holy days of Ramadan, Muslims are prohibited from eating during daylight hours and the administration, in 1977, granted a Muslim request that each participating Muslim be supplied each evening with a bag containing three sandwiches, milk and dessert. In order to secure these meals, however, participating inmates were required to sign up in their committed names, and committed names were used on the bags.

The defendants maintain that the committed name policy is justified in the interest of administrative convenience, and it is fair to say that it is more convenient for the administration to use committed names than to recognize name changes. Such evidence as there was upon the issue, however, indicated that a policy which recognized name changes would involve no substantial problem for the institution and that the record alterations needed to initiate such a policy would require less than a man-day of work.

### B. *Analysis.*

The "free exercise" principles reviewed in connection with the pork issue are equally applicable to the claims relating to the plaintiffs' Muslim names.[13] Once again the

---

13. I note at the outset that whether or not an inmate has had his name changed by court order pursuant to 10 Del.C. § 5901, *et seq.* is not relevant to the issues raised in this case.

The Delaware courts have held that even without pursuing the statutory procedure for a change of name, there exists a common law right to change one's name without court proc-

initial inquiry is whether the claims asserted involve the *bona fide* practice of plaintiffs' religion.

 As earlier noted, defendants do not challenge the sincerity of plaintiffs' faith. Nor do they dispute that converts to plaintiffs' faith ordinarily adopt new Muslim names. They dispute, however, that plaintiffs' abhorrence of their former, non-Muslim names is religiously based. In support of their argument, defendants point to evidence which suggests (1) that the Muslim religion does not prohibit its adherents from responding to their former, non-Muslim names and (2) that plaintiffs' hatred for those names derives from the slavery experience of their forebears. Defendants conclude from this evidence that plaintiffs' resistance to use of their old names is socially rather than religiously based. Accordingly, they contend that they may continue to utilize plaintiffs' non-Muslim names for all purposes without burdening the free exercise of their religion. I disagree.

 First, it is clear that protected religious expression encompasses more than orthodox or institutionalized practices. To be protected, a particular form of religious expression need not be mandated by one's religion or even endorsed by a majority of its adherents, so long as it is an expression of a sincere, religiously based conviction.[14] Indeed, neither the federal courts nor prison administrators are authorized to determine what is an orthodox religious expression or belief and what is not. *Fowler v. Rhode Island*, 345 U.S. 67, 70, 73 S.Ct. 526,

97 L.Ed. 828 (1953); *Teterud v. Burns*, 522 F.2d 357 (8th Cir. 1975). Since I believe the testimony of the plaintiffs that acknowledgment of their old names is religiously offensive to them, the absence of an institutionalized mandate regarding a Muslim's response to being addressed by a non-Muslim name is not fatal to plaintiffs' case.

Moreover, while it is true that plaintiffs view those names as insulting for reasons which could be described as historic or social, it does not follow that their animosity towards those names is without a religious base. Plaintiffs regard their old names as having had their genesis in the institution of slavery, but as earlier noted, they also regard those names as representative of a spiritual identity they no longer have. Moreover, they interpret the Holy Quran as condemning the use and recognition of their old surnames.

 Accordingly, I conclude that plaintiffs' adoption of Muslim names and their desire to be free of the use of their previous names is a part of the practice of their religious faith. I also find that the defendants have failed to show that the committed name policy serves a compelling state interest.[15] Accordingly, to the extent that policy inhibits or burdens plaintiffs' use of their Muslim names or their refusal to acknowledge their old names, its enforcement is inconsistent with the First Amendment.

 It does not follow, however, that plaintiffs are entitled to have the institution and its staff utilize their Muslim

---

ess. *See Degerberg v. McCormick*, 40 Del.Ch. 471, 184 A.2d 468 (1962). Since the defendants do not dispute that plaintiffs have adopted Muslim names in a manner consistent with the common law, all plaintiffs stand in the same position.

**14.** Consistency with the tenets of a well established religion may be persuasive evidence on the issue of the plaintiffs' sincerity, but it is not an essential characteristic of protected religious expression. *Stevens v. Berger*, 428 F.Supp. 896 (S.D.N.Y.1977); *Theriault v. Silber*, 391 F.Supp. 578, 580 (W.D.Tex.1975).

**15.** Numerous cases have held that administrative convenience is not a compelling state interest. *E. g., Memorial Hospital v. Maricopa*

*County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). It is unnecessary to so hold in this case, however. Assuming that some level of administrative burden and expense might qualify as a compelling state interest, the minimal effort and expense necessary to recognize post-commitment name changes clearly does not rise to that level.

names for all purposes. The Free Exercise Clause protects one's own religious expression and restricts the activities of others only to the extent necessary to afford that protection. Thus, for example, this Court has previously held that a Muslim inmate has no constitutional right to dictate how prison officials keep their records of prisoners. *Al-Hagg Rauf Hassan Abdul Muhammad v. Redman*, Civil Action No. 78–12 (D.Del. January 11, 1978). Indeed, a State may identify its citizens by any name, number or symbol it chooses, and it may do so consistent with the First Amendment even though the means of identification may be personally offensive to the person identified. For this reason plaintiffs are not entitled to an injunction requiring defendants to utilize their Muslim names for all purposes.[16]

But the State of Delaware, acting through the defendants, has done more than utilize plaintiffs' non-Muslim names for identification purposes. It has required plaintiffs, upon pain of punishment or the withdrawal of benefits, to utilize religiously offensive names to describe themselves. This it may not do absent a compelling state interest.

In *Stevens v. Berger*, 428 F.Supp. 896 (S.D.N.Y.1977), for example, an attack was made upon the State's insistence that applicants for welfare payments obtain and supply Social Security numbers as a condition of their entitlement to benefits. The plaintiffs, suing on behalf of themselves and their four minor children, testified that, in their view, the use of Social Security numbers was a device of the Antichrist and that they feared that the children, if numbered in this way, might be barred from entering Heaven. Judge Weinstein, after satisfying himself of the sincerity of the plaintiffs and of the religious nature of their belief, held that the State, absent a compelling state interest, may not condition the conferral of a benefit on the willingness of a citizen to engage in conduct which is abhorrent to him or her on religious grounds. After reviewing the evidence with respect to the role of Social Security numbers in combating welfare fraud, the court concluded that the State's interest in policing its welfare system could be effectively served without burdening the plaintiffs' right to the free exercise of their religion. The State was, accordingly, enjoined from requiring plaintiffs to submit Social Security numbers as a prerequisite to the receipt of benefits.

The same principles foreclose a State, absent a compelling state interest, from insisting that an inmate identify himself by a religiously offensive name in order to obtain food, clothing or other significant privilege.

Since it is clear that the committed name policy is applied in this manner from time to time and since it serves no compelling state interest, plaintiffs are entitled to appropriate injunctive relief.

16. Nor is the adoption of Muslim names by the Administration mandated by the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs correctly point out that a State may not discriminate against or among inmates on the basis of religious conviction and that a policy which does so, whether on its face or in its application, is impermissible under the Equal Protection Clause. *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Lee v. Tahash*, 352 F.2d 970 (8th Cir. 1965); *McLaughlin v. Cunningham*, 344 F.Supp. 816 (W.D.Va.1972). Plaintiffs have failed to prove, however, that such discrimination has in fact occurred at D.C.C. with reference to names. The policy of using committed names is religiously neutral on its face. And, while there is ample evidence that it has frequently been applied to Muslims, there is no persuasive proof that it has not been applied with a similar degree of consistency to others. There is some evidence that staff members refer to a homosexual inmate who has changed his name by his new name but there is also evidence that the staff frequently uses newly acquired Muslim names despite the institution's policy. All that I infer from this evidence is that the policy of requiring the use of committed names is not universally enforced. It is also true that Superintendent Redman's order regarding incoming mail referred specifically to Muslim mail rather than to all inmate mail, but this can as easily be attributed to the conceded fact that application of the policy to Muslim mail was the then current issue, as to discrimination against Muslims. Accordingly, I decline to draw the inference that an anti-Muslim *animus* warps the application of D.C.C.'s facially non-discriminatory policy regarding committed names. Thus, I find no Fourteenth Amendment violation.

Nor, absent a compelling state interest, can the State put a citizen to the choice of engaging in conduct or expression which is religiously offensive to him or her or suffering punishment. For this reason, a State may not, absent a compelling state interest, impose sanctions upon an inmate for failing to acknowledge that he is "John Smith" or for failing to perform a task under circumstances where performing it involves acknowledgment of a religiously offensive name. Since it appears that plaintiffs have received twenty-four hour lockups for failing to acknowledge their non-Muslim names, relief will have to be fashioned in this area also.

This obviously does not mean that Muslim inmates are free to disregard orders whenever a member of the staff fails to address them by their Muslim names or that they may not be disciplined if they do disregard such orders. Nor does it mean that Muslim inmates have license to act with disrespect or in a disorderly manner when their non-Muslim names are used. It simply means that an inmate may not be disciplined for his failure to acknowledge his non-Muslim name.

There are additional problems raised by the Administration's extension of the committed name policy to the area of mail processing.[17] The starting point in analyzing prison restrictions which regulate correspondence between inmates and non-inmates is the Supreme Court's decision in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The Court there passed upon a challenge to regulations of the California Department of Corrections relating to censorship of prisoner mail, both incoming and outgoing. As a starting point, the Court noted that more was at stake in that case than "prisoners' rights". Justice Powell stated:

> In determining the proper standard of review for prison restrictions on inmate correspondence, we have no occasion to consider the extent to which an individual's right to free speech survives incarceration, for a narrower basis of decision is at hand. In the case of direct personal correspondence between inmates and those who have a particularized interest in communicating with them, mail censorship implicates more than the right of prisoners.
>
> Communication by letter is not accomplished by the act of writing words on paper. Rather, it is effected only when the letter is read by the addressee. Both parties to the correspondence have an interest in securing that result, and censorship of the communication between them necessarily impinges on the interest of each. Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech. And this does not depend on whether the nonprisoner is the author or intended recipient of a particular letter, for the addressee as well as the sender of direct personal correspondence derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with intended communication. *Lamont v. Postmaster General*, 381 U.S. 301 [85 S.Ct. 1493, 14 L.Ed.2d 398] (1965); accord, *Kleindienst v. Mandel*, 408 U.S. 753, 762–765 [92 S.Ct. 2576, 2581–2583, 33 L.Ed.2d 683] (1972); *Martin v. City of Struthers*, 319 U.S. 141, 143 [63 S.Ct. 862, 87 L.Ed. 1313] (1943).
>
> \*　\*　\*　\*　\*　\*
>
> Accordingly, we reject any attempt to justify censorship of inmate correspondence merely by reference to certain assumptions about the legal status of prisoners.

416 U.S. at 408–9, 94 S.Ct. at 1809. *See also Battle v. Anderson, supra*, 376 F.Supp. 402, 425. The Court then set out to determine the proper standards for deciding

---

17. Similar problems arise from the application of the committed name policy to the area of visitation. These problems will not be addressed, however, because the evidence regarding such an application is extremely sketchy.

In particular, I am unpersuaded that any of the individual plaintiffs, or any member of the Mosque for that matter, has been denied a visit because a visitor asked for him in his Muslim name.

whether a particular "practice relating to inmate correspondence," 416 U.S. at 413, 94 S.Ct. at 1811, violates the First Amendment. The Court stated:

> [W]e hold that censorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials . . . must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

416 U.S. at 413, 94 S.Ct. at 1811. *See also Battle v. Anderson, supra,* at 425.

While *Procunier v. Martinez* was based upon the First Amendment rights of non-inmates, which are "inextricably meshed" with those of inmates, it is clear after *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), that inmates have First Amendment rights of their own. In *Pell,* the Court stated:

> [A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*See also, Guajardo v. Estelle,* 580 F.2d 748, 760 (5th Cir. 1978); *Woods v. Daggett,* 541 F.2d 237, 240 (10th Cir. 1976); *Aikens v. Jenkins,* 534 F.2d 751, 755 (7th Cir. 1976).

■ In this case, it is clear that Superintendent Redman, in March of 1977, ordered that mail addressed to inmates in their Muslim names not be delivered. When asked why he had issued that order, Redman testified: "I do not recognize the Muslim names." Thus, this is not a case where the defendant asserts that mail to inmates in their Muslim names could not be delivered because it was difficult to ascertain to whom it should be delivered. Indeed, the evidence convinces me that the mailroom officers had little trouble ensuring that such mail reached the intended recipients. Rather, I believe Superintendent Redman issued his order simply because it was consistent with the pre-existing committed name policy to do so. In any event, however, it is clear that he has failed to show that the restriction which he placed upon the delivery of mail in any way serves a significant interest of the correctional system. In fact, Superintendent Redman did not attempt to articulate such an interest in the course of his testimony. It follows that the plaintiffs are entitled to an injunction prohibiting the practice of non-delivery of mail addressed to them in their Muslim names.

■ Turning from injunctive relief to damages, the only defendant shown to have personal involvement in the violations of plaintiffs' First Amendment rights with respect to their Muslim names was Superintendent Redman. While it was not shown that he originated the committed name policy, it is clear that he was responsible for its enforcement against the plaintiffs. It follows that Superintendent Redman alone is potentially liable for damages. *Rizzo v. Goode, supra; Hampton v. Holmesburg Prison Officials, supra.*

Superintendent Redman, like Ms. Patterson, asserts that he cannot be held personally liable because he is entitled to official immunity. As with Ms. Patterson, this contention requires an inquiry into whether the Superintendent acted in good faith and whether his actions were consistent with a reasonable person standard.

■ I am satisfied that Superintendent Redman did not intentionally violate the plaintiffs' rights. He believed that the institution was entitled to identify inmates by their committed names and extended the committed name policy to the area of mail

delivery without giving any thought at all to the free speech rights of Muslim inmates and those who wished to correspond with them. Accordingly, I conclude that he has satisfied the subjective prong of the official immunity test.

Given this finding of good faith on Superintendent Redman's part, it is clear that he is entitled to immunity with respect to all of his conduct other than his mail order. None of the rights of the plaintiffs which he violated, other than their free speech rights, can fairly be said to have been clearly established as that concept is articulated in *Procunier v. Navarette,* and, as earlier noted, a public official who acts in good faith cannot be denied immunity under the teachings of that case in the absence of a clearly established constitutional right.

■ The situation with respect to the mail order is different, however. Three years before that order the Supreme Court of the United States had held that restrictions may be imposed on inmates' correspondence only if they can be justified by the State's "substantial governmental interests of security, order and rehabilitation". *Procunier v. Martinez, supra,* 416 U.S. at 413, 94 S.Ct. at 1811. Accordingly, this right was clearly established when Superintendent Redman restricted plaintiffs' mail delivery for a reason wholly unrelated to security, order or rehabilitation.

The remaining question is whether a reasonable person in Superintendent Redman's position would have known enough about the law to realize plaintiffs had this clearly established right.[18] I conclude that answer must be in the affirmative.

Superintendent Redman in March of 1977 had overall management responsibility for a penal institution housing approximately 650 inmates. The record indicates that he had ready access to legal advice from the Attorney General's Office.[19] When he issued his mail order he was not acting under exigent circumstances or other time pressure. He thus had the opportunity to make a deliberate and studied decision. Finally, it is important that the action which he proposed to take at that time was one that dealt with areas which I believe a reasonable person in Redman's position would have recognized as particularly sensitive—namely, mail censorship and religious expression. Under these circumstances, I am convinced that a reasonably prudent Superintendent, if he were not already aware of the *Martinez* and *Pell* decisions, would have sought and obtained legal advice before issuing an order like that issued by Superintendent Redman on March 30, 1977. It follows that Superintendent Redman is not entitled to official immunity with respect to that order.

While I conclude that Superintendent Redman is liable for damages suffered by plaintiffs as a result of his March 1977 order, the record is virtually devoid of any evidence from which such damages could be determined and assessed. It is clear that some incoming mail was not delivered, but the evidence does not indicate whether only an occasional letter was addressed to a plaintiff solely in his Muslim name or whether there were regular correspondents who wished to write to plaintiffs solely under their Muslim names and who continued to insist on that course even after learning of the committed name policy. Nor was there any testimony about any unsuccessful effort of a plaintiff to mail a letter out of the institution.

■ The plaintiff in a civil rights action must prove his or her damages;

---

**18.** There is no suggestion here that Superintendent Redman was reasonably mistaken about the facts or the effect of his mail order when it was issued. Accordingly, we need not inquire as to whether a reasonable person in Superintendent Redman's position would have known enough about the facts.

**19.** Superintendent Redman testified at trial that he had asked for an opinion of the Attorney General's Office regarding the validity of the committed name policy, but that he had not received a response as of the time of trial. The record does not disclose when he solicited the opinion, and I infer that it was after March of 1977. In any event, I find that a reasonable person in Superintendent Redman's position would have insisted on some legal advice regarding the validity of his mail order before issuing it.

damages will not be inferred solely from the fact that a constitutional violation has occurred. *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Evidence of a violation alone will warrant a judgment for nominal damages. *Carey v. Piphus, supra.* I conclude that this is the appropriate course in this case.

## CONCLUSION

The individual plaintiffs are entitled to injunctive relief which will assure their access to the information regarding the pork content of food served at D.C.C. which is available to the kitchen staff. In addition, they have established their right to have mail addressed to them solely in their Muslim names delivered as any other mail and their right to be free of the imposition of punishment of any kind as a result of their failure to use or acknowledge their non-Muslim names. Finally, each of the individual plaintiffs is entitled to have a judgment against Superintendent Redman entered in his favor in the amount of One Dollar. The Court will confer with the parties regarding an appropriate form of judgment.[20]

---

**20.** All other relief sought by any plaintiff against any defendant will be denied.